164 So.2d 200 (1964)
Green DRIGGERS, Appellant,
v.
STATE of Florida, Appellee.
No. 31758.
Supreme Court of Florida.
May 22, 1964.
*201 Ben Lindsey, Perry and Parker, Foster & Madigan, and Seymour H. Rowland, Jr., Tallahassee, for appellant.
James W. Kynes, Atty. Gen. and James G. Mahorner, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
The appellant, Green Driggers, appeals from a judgment and sentence of death for the first degree murder of his wife, Marie Driggers.
On this appeal the sole question presented is the sufficiency of the evidence to support the judgment of the trial court.
Appellant, who is the only living eyewitness to the incident which claimed the life of his wife, testified that he picked his wife up at the home of his parents early in the morning of July 7, 1961. The evidence shows the time was 3:15 A.M. and that the wife had gone to his parents' home because she was upset over a decision she and her husband had made that it would be impossible, because of financial difficulties and lack of room, for them to care for the children of her ill sister.
Appellant testified that after leaving his parents' home without argument, he and his wife proceeded in their car towards their home which was located near the ACL Railroad about a quarter of a mile from the point where the railroad track crosses the Suwannee River on a trestle bridge. At his wife's suggestion, instead of stopping at their home, they drove past it to the river to further discuss their decision not to care for decedent's sister's children.
According to the appellant when he stopped the car at the foot of the trestle decedent jumped from the car and ran onto the trestle crying "I am going to end the trouble now." Then in an effort to prevent her from jumping he ran after her, grabbed her and she fell. A scuffle then ensued on the tracks and trestle during which she got loose from him and ran further out on the trestle over the river. He managed to grasp her again and she fell face forward. He fell and the scuffle continued but she broke away again and as he was begging her not to go any further she turned around, stumbled, fell against a steel railing and dropped through a space between the track and the railing into the river. Appellant testified that as she plummetted down he heard "one dim noise on the metal as she went down there from something I heard her hit" and then he heard her hit the river.
After the fall appellant could not remember whether he jumped in after her or went back to the river's edge and waded in but he testified that he did go into the river to try to find her. His efforts to locate her were futile. He then drove his car back to his house where he awakened his children and requested the telephone operator to notify Sheriff Parker that his wife had fallen off the bridge. He then asked his daughter to call his wife's brother.
The evidence reveals that these calls were made at about 3:40 A.M. Thus only 25 minutes, at most, elapsed between the time appellant picked his wife up at his parents' home at 3:15 A.M. and the time he returned to his home when he alerted a law enforcement official and relatives.
After calling the operator and instructing his daughter to call others, appellant went to his parents' home and got the key to his father's boat which was moored on the river bank. He then returned to the river, removed his pants, unlocked the boat and drifted downstream without a paddle about 300 feet until the boat eddied into the *202 shore. Then he walked back to the trestle where he was met by relatives of his wife who had been notified of the tragedy by appellant's daughter.
Later, the sheriffs of the two counties bordering the river appeared on the scene and appellant pointed out to them the approximate spot where decedent had fallen from the trestle. According to the testimony of these witnesses appellant did not at the scene, or when questioned later in the day, tell of the scuffles with his wife, but only remarked that she had fallen.
Sheriff Parker testified that when he talked with the appellant he was under "shock or distress" and was "not completely normal."
The body of Marie Driggers was found at 7:55 A.M. on July 7th, the morning of the tragedy, about six miles downstream. The testimony of a pathologist showed that decedent's face was cyanotic and that her body bore multiple wounds and abrasions. These included a deep cut on the scalp, bruises under both eyes, a bruised and cut mouth, and a swollen nose. It was the opinion of the pathologist that decedent was rendered unconscious by a blow to her skull which caused the deep cut. He further estimated that she had lived approximately 30 minutes after the blow and that her death was caused not by drowning but by suffocation. On cross examination he testified that his opinion that decedent had lived 30 minutes after the blow to her skull was subject to a thirty minute margin of error and that the blow to her head could have caused her death.
Pieces of hair with the same characteristics of decedent's hair and spots of human blood were found on the trestle and tracks.
When decedent's body was discovered her dress was torn and marked with a black substance similar to tar, asphalt or creosote like that found on the trestle and cross ties.
Appellant was found to have scratches on his neck, an abrasion on one cheek and, at one place, an abrasion on his back and shoulder.
Sheriffs Parker and Williams testified that they examined appellant's auto between 7:30 and 8:00 A.M. on the morning of the incident and found no evidence of moisture on the floorboard or seats, which were plastic covered, although appellant testified he drove his car after coming out of the river earlier that morning.
Witnesses testified that when they saw appellant at the scene immediately following the sounding of his alert that he had the smell of whiskey on his breath. Some testimony indicated that he was under the influence of alcohol but none indicated that he was intoxicated. One witness testified that on the morning following the tragedy appellant asked her to get some whiskey he had thrown from his car between the river and his house.
Appellant admitted that he had three drinks of whiskey during the evening prior to the fatal event. This was corroborated without conflicting testimony. However, he testified that after taking these drinks he went to sleep on his front porch at a time which the evidence shows to have been about or shortly before midnight, and that he slept until shortly before picking his wife up at 3:15 A.M.
The evidence shows that on the evening preceding the death of Marie Driggers she and appellant had mutually decided that they could not accede to her sister's request that they drive to Jacksonville and bring back her children for a protracted visit while her sister was hospitalized. Appellant and his wife then called on other relatives who had also been contacted by the sister and informed them of their decision. There was no evidence of conflict between appellant and his wife. After completing the visits to the relatives appellant then left his wife and children at home and drove off to visit a friend.
Marie Driggers sat on her front porch crying for a while then in the company of her son walked to the home of appellant's *203 parents where she remained until appellant called for her at 3:15 A.M. the following morning.
Appellant returned home between midnight and 1:00 A.M. and dropped off to sleep on his porch. On awakening shortly before 3:00 A.M. he entered the house, discovered that his wife was out, correctly guessed that she was at his parents' place, and went to get her.
There is evidence that the decedent was upset over her inability to grant her ill sister's request for assistance. There is no evidence of any quarrel between appellant and decedent, or evidence that appellant showed anger or ill will toward the decedent. A relative of decedent testified that earlier in the evening appellant's voice sounded "dry as sandpaper" and that he appeared "mad" at decedent. On the other hand the companion with whom appellant thereafter spent the evening, and with whom he had three drinks of whiskey, testified that over the course of some two hours appellant never mentioned any marital problem, was normal in his attitude, did not appear to be disturbed and was happy and carefree.
The above, though only a summary, depicts all of the evidence found in the record before us.
We do not find it to be sufficient to establish with the required certainty that Marie Driggers met her death by the criminal act of the appellant, or, assuming that he did cause her death, that his action was premeditated as it must have been to constitute murder in the first degree.
It is obvious from the foregoing that the State's case against the appellant is based upon circumstantial evidence.
We have repeatedly held that in order for a conviction to be sustained on such evidence it must not only be consistent with defendant's guilt, but it must also be inconsistent with any reasonable hypothesis of his innocence. Davis v. State, Fla. 1956, 90 So.2d 629, and cases cited therein.
In the last cited case we pointed out that "Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence."
In the case now before us all of the evidence against appellant is as consistent with his version of the tragedy and with his innocence as it is with his guilt.
Moreover, the evidence wholly fails to prove premeditation on the part of the appellant.
For the foregoing reasons the judgment appealed from is reversed and the cause remanded for further proceedings consistent herewith.
DREW, C.J., and THOMAS, ROBERTS, THORNAL and HOBSON (Ret.), JJ., concur.