348 So.2d 26 (1977)
William Peter WRIGHT, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. CC-424.
District Court of Appeal of Florida, First District.
June 27, 1977.
Samuel S. Jacobson of Datz, Jacobson & Dusek, Jacksonville, for appellant.
Robert L. Shevin, Atty. Gen., and Charles W. Musgrove, Asst. Atty. Gen., for appellee.
PER CURIAM.
William Peter Wright, Jr. (hereinafter referred to as appellant) was indicted, tried and convicted of murder in the first degree and sentenced to life imprisonment, to serve 25 years before becoming eligible for parole. This appeal is from the judgment of conviction and sentence.
*27 Laura Wright, wife of appellant, was found dead after being buried in a hole dug by a bulldozer operated by appellant. The scene of the event was a farm operated by appellant's father and employer. Appellant asserted in the trial, and asserts here, that the death of his wife was accidental. The State's contention was, and is, that death was caused by the intentional and premeditated act of appellant in first striking or otherwise causing serious bodily injury to his wife and thereafter burying her with the bulldozer.
The primary contention of appellant is that the only evidence of premeditation introduced in the trial was that of the associate medical examiner of the City of Jacksonville that the deceased had suffered severe injuries before burial. Appellant argues that such was (if admissible) only an inference drawn by him from the examination of the body of the deceased shortly after death. Moreover, such inferences were made by the doctor, a medical expert, far beyond his competence as an expert witness and were, therefore, incompetent. Appellant asserts that the State relies wholly on this evidence as proof of premeditation and cites the opening statement of the State's attorney before the jury, viz: "We don't have to consider anybody's testimony except that of [the medical examiner] and that of the defendant". Our review of the record convinces us that this is true for, as hereafter set forth, the appellant's version of the events of the afternoon and evening of the death to the effect that the death was accidental is not controverted except by the inference and deductions of the medical examiner drawn from his examination of the body that injuries of a serious nature had been inflicted on the deceased shortly prior to being buried, and that, in his opinion, such injuries were not caused by the bulldozer or in the process of being buried by the bulldozer. The vital question here is whether the medical examiner was qualified to so testify and convey to the jury his conclusions that there had been prior substantial injuries which contributed to the ultimate death by suffocation.
At the threshold, however, we are faced with the fact that the appellant never interposed any objection to the medical examiner's testimony. The State says it is now too late to do so. Appellant argues that the effect of the evidence was so devastating, so extensive and prejudicial that its influence so pervaded the trial that it prevented a calm and dispassionate consideration of the case and a conviction could not have occurred otherwise; therefore, the error was fundamental and should be considered by this Court regardless of objection.[1] Moreover, even if such evidence is now beyond review, we must consider the fact that there were no witnesses to the events causing death. There is no direct evidence of the forces which produced death. The State relies on the circumstances bearing on the case and, particularly, the deductions and inferences drawn from these circumstances to prove that the deceased met her death through the premeditated, deliberate acts of appellant. In an unbroken line of cases, the courts of this state have held that, under such conditions, the evidence must be not only consistent with guilt but inconsistent with innocence, or any reasonable hypothesis thereof.[2] It is the total exclusion of every reasonable hypothesis of innocence which clothes mere circumstances with the force of proof of guilt.[3] "If the facts in proof are equally consistent with some other rational conclusion than that of guilt, ... if the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence *28 cannot amount to proof, however great the probability may be."[4]
The State, in its brief here, accepts the statement of facts presented in appellant's brief (but not appellant's assertion that the order of proof was significant). In view of this, we quote, verbatim, that portion of appellant's brief, viz:
"State's Case

"A worker at the Wright dairy barn testified that around 10:00 P.M., on November 10, 1975, Wright came to the barn with his wife and then drove with her out into a pasture.
"A short while later Ralph and Betty Jo Higginbotham, Wright's sister and brother-in-law, who lived at the dairy, heard the Wright bulldozer which was parked in the pasture start up and continue running. Higginbotham immediately got into his pickup truck and drove to the pasture. As he first entered the pasture he could from a distance see somebody crawling on his hands and knees in the lights of another pickup truck or of the bulldozer. As he drew nearer the other pickup truck came out to meet him. At that point he found that the driver of the other truck was Pete Wright.
"As the trucks met, Wright said, `Ralph, Ralph, you've got to help me ... I buried Laura with the bulldozer.' The two men then drove to the bulldozer and began to dig for her with their hands in a new hole approximately ten feet long and wide and three feet deep at the deepest part.
"When they were unable to locate Laura within a few minutes, Wright said he was going to use the bulldozer to try to dig her out.
"Then with the brother-in-law walking slowly alongside as a guide, Wright began to reexcavate the hole with the bulldozer. They made one push almost all the way across the hole and then saw Laura's arm come up from under the blade. The brother-in-law shouted to Wright who backed the bulldozer away. The two young men then got down in the hole and began to dig out around the girl with their hands. They dug the body out as far as her waist. Higginbotham checked for a pulse, and Wright began to give mouth-to-mouth artificial respiration. They shortly determined, however, that she could not be resuscitated.
"The two men then left to report what had happened.
"The Associate Medical Examiner for the City of Jacksonville testified that the immediate cause of death was suffocation from inhalation of dirt and mud. In addition he reported blunt, crushing wounds to the chest and upper thorax area and severe similar head and neck injuries, all of which would have been fatal but for the suffocation. Additionally he noted bruises and a severe laceration upon the lower extremities.
"The balance of the state's case consisted only of descriptions of the death scene.
"Defense Case

"The principle defense witness was Wright.
"Wright testified that the night in question had started happily enough. After he got off work, the couple went to Jacksonville and bought Laura Wright a car.
"They then returned to their home in Callahan. They had supper, and Wright began to watch the Monday night professional football game. During the course of the evening they had two or three beers.
"While Wright was watching the football game, Laura Wright began to argue with him about a life insurance policy which she thought was being kept in force for Wright's former wife. This developed into a spat.
"As the argument subsided, they decided during halftime to go for a ride, a good way they had found to get over quarrels. They intended to ride out to see some deer that had been feeding on sorghum planted by Wright's father in a pasture. *29 "As they were riding Laura Wright became upset and despondent. She ultimately said she wished she were dead, a statement she had made during previous despondencies.
"Wright testified that things had been going very well for them and that he therefore became impatient with his wife's attitude. He responded with `... if that's what she wanted, we could arrange that.' He said that he did this to shock her and show her she really didn't want to die. He testified he was mad.
"When Mrs. Wright did not desist, he thought he would call her hand by digging a grave for her. He started the bulldozer and dug a hole, figuring `. . that would have been it.' But instead of backing down, Mrs. Wright walked into the hole and lay down in it.
"This, said Wright, surprised him. He decided to scare her out of the hole or call her bluff by pushing a little dirt into the hole. He then shoved some dirt forward and backed the bulldozer up, expecting to see his wife get up and out of the hole. He said he did not think he had pushed enough dirt even to get to where he had seen her lying.
"He then said, `All right, Laura, get up.' When she did not get up he walked over to the hole. At that point he realized, he testified, that she was covered up and jumped into the hole and began to dig frantically with his hands. While he was digging he saw his brother-in-law's truck approaching and hurried to it for help. His testimony as to the events from that point on was just as his brother-in-law's had been.
"A land surveyor testified to the exact dimensions of the hole. He said 8.6 cubic yards of dirt had been excavated from it and only 2.8 yards (32 1/2%) had been pushed back.
"A car salesman testified to the purchase of a car for Mrs. Wright just three or so hours before the fatal events.
"A Caterpillar heavy equipment salesman testified to the very limited speed of the bulldozer and to the inability of the operator to see immediately in front of the blade.
"Various other defense witnesses, including the decedent's brother, testified to her emotional volatility. A psychiatrist who had previously treated her testified to a history of suicidal impulses."
Dr. Legowik is a medical doctor. He received his M.D. from Northwestern and was an intern and resident in pathology at Western Memorial Hospital; thereafter, four years of forensic science and one year of forensic pathology. He said he was a specialist in pathology and had been employed as a forensic pathologist for seven years and that he had been qualified as an expert witness in forensic pathology "in excess of 40 or 50 times". He was offered as an "expert witness in the field of forensic pathology"[5] and, without objection, accepted by the court as such.
Dr. Legowik testified to the effect that the deceased had been injured prior to burial. That constituted the principal element of the state's theory of premeditation and that, the appellant says was wholly beyond the competence of a forensic pathologist to give. The thrust of his testimony was that the deceased's injuries were consistent with being bulldozed in the hole after injury, that many of her injuries had not come from being run over by the bulldozer after burial or during the effort to dig her out, nor had they been inflicted by the treads of the machine, that the pattern of injuries was inconsistent with appellant's story of the events culminating in her death. Examples of such testimony are:
"Q It is consistent with the facts as you know them that the injury could have occurred after the body was covered with the dirt?

*30 "A Remotely possible, but the linear distribution of the injury, the fact that the injury is so linear and relatively clear-cut, one would have to suppose that only a very shallow amount of dirt would have been present, if anything, if the injury were supposed to have occurred as the dirt was placed over the body, because any significant amount, say, more than about two or three inches, would have distributed the force of the injury over a wider area. Because of the nature of the material, it would act sort of like a fluid distributing the energy so that the more material between the body and the striking agent, the more diffuse the pressure is exerted. If you have a very narrow object, you need only apply a small amount of force to create a fairly large amount of injury, but as you widen the area of application of the force to the body, you could apply a large amount of force if you distribute the energy over a wide area, such as  take large balloon tires, or some large 
"Q Excuse me, Doctor.
"A O.K.
"Q Are you saying if she were insulated or protected by a thick coat of dirt, those injuries would not have been caused?
"A I don't feel that linear pattern of injury would have occurred if a thick coating of the type of earth that I saw at the scene were present over the body."
* * * * * *
"Q Would that injury, then, have been consistent with the blade contacting the body in that manner and then passing on upon her head?
"A I don't think so. The reason is, if this were, in fact  we see from the way she was in the hole that, whatever the orientation of the body was, the legs and feet were at a lower level than the hips, because you could see the hips when you looked at the upper part of the body. Now, this type of moist earth acts as an anchor for anything to stick in it. Now, if you take a soft body and anchor it and then take a `dozer blade and scrape over the top of the body, you might get injury, but you will get scraping and abrading type injuries. The injuries are more of a contact type, crushing type, injuries than they are scraping or abrading type injuries.
"Now, the injuries associated with the neck injury, you might speculate that these could be associated with some sort of scraping type, but it would be a motion of only three or four inches backwards and forwards. If the body was really anchored, was embedded in this earth, the several thousand pound bulldozer would have proceeded to separate portions of the body from the other parts of the body. The body wouldn't  the body wouldn't stay together. Part of it would be anchored and the other part would be moved off away for her. There was no evidence of any other scraping type injury on the back, legs, buttocks or the like.
* * * * * *
"Q It has been suggested that the treads on the bulldozer went up on to the body of Laura Sykes Wright while she was still in the earth. If that were so, would that explain or be consistent with the crushing type injuries to her upper chest and head which you described?
"A I don't think so. Now, as I think about this, the reason I have for this is as follows: If the legs are extending out in this fashion (drawing), in order for the treads, if the body is extending out here, which is about the direction it would have to be  in order for the tread to pass over here, it's going to have to pass over her pelvis and her legs. There were no pelvic fractures, there were no hemorrhage in the posterior left side of the thorax  not the thorax, but of the abdominal wall. There were no bruises of the thighs, there were minimal bruises, and the only significant abrasion or laceration type wounds are those present over the top of the feet, and the top of the feet would be directed away from the direction of travel; so that if the injuring force was coming in this direction, it would encounter the bottom of the feet first. The only way it would possibly hit the top of the *31 feet is when it was passing backwards, if, in fact, it was. But the injuries on the other portions of the body, to me, make it  I find it difficult to believe that no injuries at all occurred until a cleat got up to her chest. Bulldozers don't scrape along, you know  and she was five foot five  these occurred, say, about two-thirds up her upper body. This would mean that the 'dozer treads would have to be just about four feet between the center of the one here and the next one. To me, I don't recollect them being that far apart."
This testimony of the medical examiner was the only testimony, if competent that tended to establish premeditation. The verdict of guilty must be supported by this evidence to stand. We hold such evidence was beyond the competence of the medical examiner to give. The theory of allowing evidence of an expert witness to be received by the triers of fact is to understand and determine an issue of fact. He must be qualified by knowledge, skill, experience, training or education to express an opinion.[6]
The effect on the verdict of the evidence of the expert here was so obvious and extensive that its admission falls within the definition of fundamental error which this Court may and should review, in the interest of justice, regardless of objection at the trial level.[7]
Now reverting to those authorities cited in the opening portions of this opinion concerning circumstantial evidence and the inferences to be drawn therefrom, the inference drawn by Dr. Legowik is not inconsistent with the inference that such injuries could have arisen from the conduct of the deceased beyond the view of the appellant after entering the hole, and beyond his sight. Nor can it be said that appellant's testimony and the undisputed events which transpired in the afternoon and evening of the death are not "[p]roof[s] consistent with some other rational conclusion than that of guilt"[8] of premeditated murder.
Appellant was the only eyewitness to the death of his wife. His version of the events, if true, would not establish criminal intent, and the other circumstances do not show beyond a reasonable doubt that there was a criminal killing. Under these circumstances, the law is that the appellant's story must be accepted.[9]
In the Drigger's case[10] the defendant was charged with murdering his wife by throwing her off a railroad bridge. There, as here, there were prior marital problems. The husband's version of the death was, as in this case, despondency of the wife and her assertion she was going to kill herself. In his attempt to stop her, he testified they struggled and she fell in the water below causing her death. The pathologist in that case testified the cause of death was suffocation  not drowning  that there were other wounds and physical evidence at the bridge indicating prior injury or death. The Supreme Court in that case, a much stronger case for conviction than this, reversed, holding that "all the evidence" in the case was "as consistent with [defendant's] version of the tragedy and with his innocence as it was with his guilt", and so it is here.
*32 REVERSED AND REMANDED FOR A NEW TRIAL.
McCORD, Acting C.J., and DREW, E. HARRIS, and MASON, ERNEST E., (Ret.) Associate Judges, concur.
NOTES
[1] Tyus v. Apalachicola Northern Railroad Company, 130 So.2d 580, 587 (Fla. 1961).
[2] Head v. State, 62 So.2d 41 (Fla. 1952); Bellamy v. State, 96 Fla. 808, 119 So. 137 (1928); and Frank v. State, 121 Fla. 53, 57, 163 So. 223, 224 (1935).
[3] Mayo v. State, 71 So.2d 899, 904 (Fla. 1954).
[4] This quotation is from Gustine v. State, 86 Fla. 24, 97 So. 207 (1923), reaffirmed in Parish v. State, 98 Fla. 877, 124 So. 444, 445 (1929), and again in Head v. State, 62 So.2d 41, 43 (1952).
[5] Forensic  "Pertaining to, connected with or used in Courts of law or public discussion and debate; adopted or suited to argumentation." Pathology  "The science of the origin, nature and course of diseases; also, the su
[6] See Florida Evidence Code  Effective 7-1-77). Also paragraph 90.702, Fla. Stat. (1976). Also Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975); Behm v. Division of Administration, State of Florida, Department of Transportation, 292 So.2d 437 (Fla. 4th DCA 1974); and Mills v. Redwing Carriers, Inc., 127 So.2d 453 (Fla. 2d DCA 1961).
[7] Rule 6.16, FAR provides: "... The court may also in its discretion if it deems the interests of justice to require, review any other things said or done in the cause which appear in the appeal record... ."
[8] Head v. State, supra.
[9] Holton v. State, 87 Fla. 65, 99 So. 244 (1924); Jenkins v. State, 120 Fla. 26, 161 So. 840 (1935); Kelly v. State, 99 Fla. 387, 126 So. 366 (Fla. 1930); Metrie v. State, 98 Fla. 1228, 125 So. 352 (Fla. 1930); Getsie v. State, 193 So.2d 679 (Fla. 4th DCA 1967); and In the Interest of G.C.O., a child v. State, 309 So.2d 608 (Fla. 2d DCA 1975). See also Hodge v. State, 315 So.2d 507 (Fla. 1st DCA 1975); and Weinstein v. State, 269 So.2d 70 (Fla. 1st DCA 1972).
[10] Driggers v. State, 164 So.2d 200 (Fla. 1964).