BOOTH, Judge.
This cause is before us on appeal from judgment of the Circuit Court, Marion County, sitting without a jury, awarding the appellee [Bison] damages for breach of contract between appellee and appellant, Peter J. Prohaska, d/b/a Walker & Company, [Prohaska].
The complaint filed by Bison alleged that Prohaska breached a contract between the parties providing for Bison to manufacture, according to the specifications provided by Prohaska, one million sets of sliding door and window locks at a price of $.57 per unit. The complaint sought full contract price plus interest for the goods sold and delivered, some 20,000 lock sets, and for lost profits. Prohaska answered, asserting by way of affirmative defense, that the goods delivered did not meet the specifications of the contract. The trial court awarded Bison $20,438.50 plus interest, representing the full contract price for the lock sets delivered and $40,265.21 representing various costs to Bison of performing the contract.
The lock sets delivered by Bison were admittedly defective and broke easily in use. The principle issue at trial was whether the failure of the lock sets was due to a faulty design provided by Prohaska (as alleged by Bison) or by the failure of the goods to meet the contract specifications (asserted by Prohaska as an affirmative defense). Three expert witnesses testified on the central issue of the cause of the defects in, or failure of, the lock sets. Plaintiff’s witness was Eugene Robert Ha-nus, president and principle stockholder of the firm that acted as subcontractor to Bison in molding the elements used in the production of the lock sets. For defendant Prohaska, expert testimony was received from Craig S. Hartley and David Jenkins, both PhDs, registered professional engineers in Florida and employees of an independent materials testing firm in Gaines-ville. The defendant’s experts were clearly qualified by professional training and experience to express an opinion on the sufficiency of the design to withstand the stresses applied by anticipated use. These witnesses also had performed the standard tests for determining whether the lock sets were in fact manufactured of material meeting the specifications of Lexan 141, as required by the contract. Two independent laboratory test reports established that the representative samples of the lock sets were in fact sub-specifications.
Dr. Hartley testified as follows:
*796 “Q Were you able to determine whether or not, in your opinion, this particular product was of proper design?
A Yes, sir, I was.
Q What is that opinion?
A My opinion, [is] the piece was of satisfactory design and strength to have withstood normal transverse load than (sic) an individual might have applied in attempting to open the door with the lock in place.”
Hartley further stated that his examination of the materials of which the lock sets were manufactured revealed “a line of holes of varying size all the way from oh, perhaps half a millimeter in diameter up to in some cases nearly as large as half the thickness of the piece, which would be about an eighth of an inch running along the center of the bar, irregularly distributed ...” and testified:
“Q Do you have any opinion as to what affect the results of your findings would have on the particular product itself?
A Yes, I do.
Q And what are those, sir?
A I believe that the presence of bubbles in the center of the piece would have reduced the section available to resist the loads and consequently would have degraded the performance of that piece and similar pieces and would have caused the stresses developed to be higher than those calculated by the designer.”
Defendant’s expert witness Jenkins testified concerning the test he performed, in part as follows:
“A In values listed in this publication I have before me from General Electric, which has patented this particular plastic composition, lists the typical values for the yield strength of Lexan 141 as nine thousand PSI, that is pounds per square inch. The ultimate tinsel (sic) strength is nine thousand five hundred PSI, and the percent elongation to rupture is typically one hundred and ten percent. Now, the tests which I performed on these ten specimens gave me a range of values which varied from a low of the yield strength of five thousand four hundred seventy-eight pounds per square inch to a high of six thousand six hundred and forty-seven PSI. The elongation ranged from a low of twenty-nine percent to a high of one hundred and twelve percent. The ultimate tinsel (sic) strength varied from seven thousand eight hundred and nineteen pounds per square inch to eight thousand eight hundred and seventy-eight pounds per square inch.
Q All of which are substantially less than the properties as specified by General Electric for Lexan 141?
A All except specimen No. 5, which indeed had low yield strength, low ultimate tinsel (sic) strength, but an elongation of one hundred twelve percent, which is within reasonable limits for this material.” (e. s.)
The only testimony introduced by the plaintiff to establish that the lock sets, though admittedly defective, were defective in design rather than in materials, was Mr. Hanus, who was allowed to testify over the objection of the defendant as follows:
“Q All right. It is your opinion then that the breakage of these units at that point would be due to any degradation caused in the molding, or is it due to a design defect, or what would be the reason it would break?
MR. FORE: Objection. Same grounds. THE COURT: Objection is overruled. THE WITNESS: I would say that the defect would be in the design that is causing the particular breakage that is occurring. We have tested parts, and had our supplier test specific parts, and have — are certain that the parts are molded properly, and that it is not a failure of the material, it is a failure of the design.” (e. s.)
Mr. Hanus had a degree in business administration, had taken some engineering, chemical and electrical courses and had “worked in plastics” for the last twelve years as a custom molder. He was in fact the owner and principle stockholder of the company which did the molding for the lock sets in question. In addition to the testimony objected to, and the defendant’s objec *797 tion to this witness as an expert in the first place, the witness testified that he had constructed lock assemblies using the Prohaska design out of aluminum and steel. In the midst of his testimony, Hanus displayed his creation and broke it easily in his hand. Hanus admittedly had no facilities at his plant for testing the tensile strength of the materials used in the manufacture of the lock sets to determine if it met the quality of specification for Lexan 141.
Florida Rules of Civil Procedure, Rule 1.390(a) defines an expert witness as:
“A person duly and regularly engaged in the practice of his profession who holds a professional degree from a university or college and has had special professional training and experience or one possessed of special knowledge or skill about the subject which he is called to testify.”
Here, witness Hanus was at best qualified to testify as to the methods and procedures of injection molding plastic components, a matter with which he had experience. The record, however, indicates that he possessed no special knowledge or skill and had no professional training or experience of any sort in measuring the stress capabilities of materials. There was no indication that he had expertise sufficient to allow him to testify concerning the structural sufficiency of the design submitted in the instant case.
In Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960 (5th Cir. 1975), the trial court rejected expert opinion testimony by a chemical engineer and professor at the University of Miami in a patent-infringement suit where the product involved was a plastic-handled bristle brush. The appellate court upheld the rejection of the expert testimony, stating:
“By Professor King’s own admissions on the record, he is not an expert in the art of plastic production equipment, and he had no prior experience in testing bristled propylene plastics.”
In Wright v. State, 348 So.2d 26 (Fla. 1st DCA 1977), this Court held that fundamental error was committed in the admission of expert testimony by a forensic pathologist who was allowed to state that the injuries sustained by a deceased had been sustained prior to burial. In rejecting that testimony, the court stated (348 So.2d at 31):
“We hold such evidence was beyond the competence of the medical examiner to give. The theory of allowing evidence of an expert witness to be received by the triers of fact is to understand and determine an issue of fact. He [expert] must be qualified by knowledge, skill, experience, training or education to express an opinion.”
In the instant case, the trial court clearly abused its discretion and committed error in admitting Hanus as an expert witness in areas clearly beyond the realm of any experience or expertise possessed by him. This error cannot be considered harmless since the testimony of Hanus is the only testimony in the record which supports the finding of the trial court that the lock assemblies were “manufactured according to the specifications and design and that any defect was due to a defect in either the specifications or design . . .’’It was on the basis of that finding that the trial court awarded the full contract price for the admittedly defective lock sets.
Accordingly the judgment below is reversed and the cause remanded for a new trial.
BOYER, Acting C. J., and SMITH, J., specially concurring.