501 So.2d 46 (1987)
UNITED TECHNOLOGIES COMMUNICATIONS COMPANY, F/K/a General Dynamics Communication Company, Carlson Construction Company and Liberty Mutual Insurance Company, Appellants/Cross-Appellees,
v.
INDUSTRIAL RISK INSURERS and Mercy Hospital, Inc., Appellees/Cross-Appellants.
Carlson Construction Company and Liberty Mutual Insurance Company, Appellants,
v.
United Technologies Communications Company, F/K/a General Dynamics Communication Company, Appellee.
Nos. 85-2339, 85-2710.
District Court of Appeal of Florida, Third District.
January 6, 1987.
As Clarified February 5, 1987.
Philip T. Weinstein and Eliot R. Weitzman, Miami, for appellant/cross-appellee United Technologies Communications Company.
Lanza & O'Connor and Stephen E. Tunstall, Coral Gables, for appellants Carlson Construction Company and Liberty Mutual Insurance Company.
Gaebe & Murphy and Michael J. Murphy, Coral Gables, for appellees/cross-appellants Industrial Risk Insurers and Mercy Hospital.
Before NESBITT and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
This is an appeal by United Technologies Communications Company[1] (United) from an adverse final judgment entered upon a jury verdict finding that United's negligence in repairing a damaged commercial telephone system in Mercy Hospital resulted in the need for subsequent and more extensive repairs costing Mercy $126,794.15.[2] Our conclusion that this judgment must be reversed with directions to enter judgment for United[3] makes it unnecessary *47 to consider the issues raised by the cross-appeals of Mercy and Carlson Construction Co.[4]
The facts leading up to this lawsuit are as follows. In 1979, Carlson Construction Co. was hired by Mercy Hospital to perform certain alterations on the third floor of the hospital. The construction was intended to accommodate a new telecommunications center to house equipment to be installed by United. In the process of the construction, Carlson's employees drilled several holes in the floor above the telecommunications center, negligently leaving one of them  located in a utility closet  uncovered when the construction ended.
Misfortune struck on a Sunday morning in March 1980 when a Mercy employee, cleaning the floor of the utility closet above the telecommunications center, allowed cleaning fluid containing phosphoric acid to drip through the unfilled hole directly onto the main frame of the telecommunications system. Almost immediately, printed circuit cards were shorted, many of the cards' components were "blown off," the control frame was noticeably damaged, and the hospital's telephone system was rendered inoperative. United was called to restore service as quickly as possible. Working around the clock, United employees had the telephone system temporarily operational by the following day. By the end of the week, after performing the extensive testing necessary to complete the emergency operation, the system was operational and the immediate crisis was over.
During the next several months, a number of problems developed in the equipment. Employees of Wescom, the manufacturer of the equipment, conducted tests of the equipment and in July 1980 concluded that the phosphoric acid solution that had leaked onto the equipment had caused extensive corrosion to key parts of the system and that replacement of the frames was required. In September 1980, United replaced the frames at a cost of $126,794.15, for which it billed Mercy. Mercy's insurer paid Mercy pursuant to its right of subrogation and, joined by Mercy, sued United and Carlson. The theory of the action against United was that United's failure to properly clean the telecommunication system at the time of the March 1980 acid leak was the cause of the ultimate corrosion and the need to replace the frames six months later in September 1980.[5]
The plaintiffs' contention that United was negligent was bottomed entirely on the testimony of one person, Harold Sanders. It was Sanders, permitted to testify over United's objection that he was not qualified to give an opinion on the matter in issue, who alone opined that if the equipment had been cleaned properly at the time of the March 1980 incident, it would not have required replacement in September 1980. All other witnesses called upon to address this same question testified that the damage done by the leaking phosphoric acid was irreversible, that is, that no amount of cleaning could have prevented the ultimate damage and that replacement of the frames was inevitable once the phosphoric acid hit.
It cannot be seriously disputed that the question of whether the ultimate damage caused by the leaking phosphoric acid could have been prevented by proper cleaning at the time of the March 1980 incident is not *48 one capable of being resolved by a jury without the aid of expert testimony. Thus, essential to the plaintiffs' case against United was that the opinion testified to by their expert provide a sufficient basis for the jury's verdict in the plaintiffs' favor and that their expert be qualified to render such an opinion. We will now examine this aspect of the case.
Hal Sanders is a consulting engineer who works for his own company. He conducts accident and loss investigations for independent loss adjustment firms specializing in fire protection and general loss analysis. Sanders' main area of concentration is combustion and explosion and the storage of chemicals, "basically in relation to fires." He described the type of work his company performs as emphasizing loss prevention rather than loss analysis  for instance, fire protection design. Sanders is a registered engineer and a member of several professional organizations mostly dealing with fire protection.
Sanders was hired by an adjustment bureau for Mercy's insurance carrier in September 1980, after United had recommended and installed new control and power frames and replaced some cards. The parts that had been replaced were still available for inspection. Sanders took photographs and scrapings from the old power and control frames. According to Sanders, the litmus paper test he performed on the scrapings showed acid in some places and base in others. Sanders testified that the deterioration was primarily from the acid spill and, to some lesser extent, from material used in the cleanup.
Over United's objection, Sanders was asked how the initial spill's cleanup in March 1980 should have been conducted in order to wash the acid off the frames and cards. He opined that the proper method would have been to flush the acid and salts away, first with a distilled water and detergent solution, then with a water and alcohol solution, and then to dry the cards or frames with an infrared heat lamp. In regard to his suggested method of cleaning, Sanders admitted that he had not done tests to support his conclusion. He said that in 1969, plastic insulation on wiring caught fire in an RCA computer plant, exposing the computer to large amounts of smoke-produced hydrochloric acid. The computers that were not burned in the fire were successfully cleaned in accordance with the procedure described by Sanders. He was thus convinced that his method would work and was of the opinion that the difference in acids was immaterial.
While United suggests that Sanders' testimony is wholly lacking in any statement that United's actions violated some recognized standard of care and is limited in effect to a declaration that the method proposed by Sanders would have worked better than the method used by United, we think that the import of Sanders' testimony, read in its entirety, is that United's cleanup was negligently done. Thus, Sanders' opinion does provide a sufficient basis for the jury's verdict, provided that Sanders was qualified to give it.
Our view of Sanders' qualifications to render his opinion is not as generous as our view of the opinion itself. As we have said, Sanders' admitted area of expertise is combustibles. He took a single analytical chemistry class in college some thirty-five years ago, but all of his work since then has been related to combustion and chemical storage. Only in a "crude sort of way" does his work involve chemical testing, because actual testing would, according to Sanders, be done by a chemist or chemical laboratory. He uses the elemental litmus paper test showing acid or base to get him "started in a direction." Sanders admitted that his only experience with phosphorous or phosphoric acid would have been in connection with a litmus paper test in college, but he had no specific memory of that. He had never performed tests to determine the effects of phosphorous or phosphoric acid and had no experience with phosphoric acid's effects before this case. Significantly, when asked whether he had been involved in either testing or another discipline that would allow him to render an opinion on the reversibility or irreversibility *49 of phosphoric acid on materials, Sanders answered that he had not.
Florida Rule of Civil Procedure 1.390(a) defines an expert as:
"a person duly and regularly engaged in the practice of his profession who holds a professional degree from a university or college and has had special professional training and experience or one possessed of special knowledge or skill about the subject upon which he is called to testify." (emphasis supplied).
It is not enough, then, that a witness is qualified in some general way  doctors cannot give expert opinions in all fields of medicine  but the witness must be possessed of special knowledge about the discrete subject upon which he is called to testify. Thus, in Husky Industries, Inc. v. Black, 434 So.2d 988 (Fla. 4th DCA 1983), the plaintiff called as its expert the fire chief of the local fire department, who was knowledgeable in the general field of fire prevention safety, including the storage of flammable and combustible materials. However, because this witness had no experience with "flame arresters," the court concluded that:
"it is apodictic that expert testimony is not admissible at all unless the witness has expertise in the area in which his opinion is sought. See Kelly v. Kinsey, 362 So.2d 402 (Fla. 1st DCA 1978). Bean admitted that the area of his expertise did not include the closing or capping of containers of the size in question in this case and that, indeed, his only familiarity with arresters related to flammable, not combustible, materials."
434 So.2d at 992.
In Consolidated Mutual Insurance Co. v. Hampton Shops, Inc., 332 So.2d 101 (Fla. 3d DCA 1976), an action for damages to machinery and wood resulting from a fire at a furniture plant, the witness in question was an insurance adjuster specializing in fire and property damage. Although the witness had investigated losses on machinery due to fire and water, had been a machine repairman for four years, and had been "brought up and raised around" his father's tool and die shop, the trial court was held to have properly excluded the witness as an expert because he had no special knowledge regarding wood.
A like result obtained in Prohaska v. The Bison Co., 365 So.2d 794 (Fla. 1st DCA 1978). There, judgment was entered for the plaintiff in a breach of contract action where the asserted defense was that certain lock sets were defective in materials rather than design. The defendant's contention on appeal was that the trial court erred in admitting the testimony of an expert witness in areas beyond his expertise. The appellate court held that the lower court had abused its discretion in admitting such testimony and reversed the judgment below because the testimony was the only evidence in the record which supported the finding of the trial court that the lock sets were merely defective in design. Although the "expert" had a degree in business administration, had taken engineering, chemical and electrical courses, had "worked in plastics" for the preceding twelve years as a custom molder, and was the owner and principal shareholder of the company which did the molding for the lock sets in question, the court said:
"Here, witness Hanus was at best qualified to testify as to the methods and procedures of injection molding plastic components, a matter with which he had experience. The record, however, indicates that he possessed no special knowledge or skill and had no professional training or experience of any sort in measuring the stress capabilities of materials. There was no indication that he had expertise sufficient to allow him to testify concerning the structural sufficiency of the design submitted in the instant case."
365 So.2d at 797.
Again, in Trustees of Central States Southeast and Southwest Areas, Pension Fund v. Indico Corp., 401 So.2d 904 (Fla. 1st DCA 1981), the appellate court reversed a lower court judgment on the ground that expert testimony was erroneously admitted. Conceding that the trial court had *50 broad discretion in determining whether the witness should have been accepted as an expert, but stressing that this discretion is not unbridled, the court concluded that the witness was not an expert as to the fair market value of property where his stated area of expertise was determining the credit worthiness of commercial property for loan purposes. Notwithstanding that the witness may have been an expert in valuation of property for one purpose, the court held that he was not an expert for the purpose for which he was offered.
Finally, in Sea Fresh Frozen Products, Inc. v. Abdin, 411 So.2d 218 (Fla. 5th DCA), rev. denied, 419 So.2d 1195 (Fla. 1982), an action for injuries sustained by the plaintiff when he slipped on a boat ramp, the plaintiff called as an expert to testify to the slipperiness of algae a person who had a doctorate and research background in the field of marine chemistry. Despite the expert's impressive credentials, the appellate court concluded that the trial court had committed reversible error in allowing the witness to testify because, inter alia, he "admitted he had never done any studies whatsoever concerning marine algae growth or its control," the very subject about which he was being offered to testify.
We believe the present case falls within the rule of law announced in the foregoing cases. Clearly the subject about which Sanders was being offered to testify was the reversibility vel non of the effect of phosphoric acid upon the metal of the frame of the telecommunications system. We do not believe it can be fairly said that Sanders, despite whatever other credentials he may have had, knew anything whatsoever about the subject at hand. Absent his expert opinion, there is no evidence to support the conclusion that United was negligent or that its negligence caused damage to the plaintiffs. Therefore, the judgment in the plaintiffs' favor is reversed with directions to enter judgment for United. The reversal of this judgment necessarily requires that the final judgment for costs also be reversed.
Reversed with directions.
NOTES
[1] Formerly known as General Dynamics Communications Company.
[2] Mercy Hospital, Inc. and its insurer, Industrial Risk Insurers, were the parties plaintiff against United and Carlson Construction Co., the party responsible for damaging the telephone system in the first instance by performing faulty construction work.
[3] During trial, United moved for a directed verdict and thereafter moved for judgment notwithstanding the verdict on the same grounds now urged on appeal.
[4] Mercy contends on its cross-appeal that the trial court erred in reducing its judgment against United, a subsequent tortfeasor, by the percentage that Mercy was found to be negligent vis-a-vis Carlson Construction Co. in respect to the initial tort causing damage to the telephone system. See Stuart v. Hertz Corp., 351 So.2d 703 (Fla. 1977). Carlson contends on its cross-appeal that, having been held legally responsible for all damages arising from the initial tort damaging the system and United's subsequent faulty repairs, it was entitled to a contribution judgment against United in the amount of the subsequent repairs of $126,794.15.
[5] United correctly states that Mercy's action against it was for breach of contract and that it was not until the last day of trial that, over objection, Mercy was permitted to amend its complaint to plead negligence. We need not address United's contention that permitting Mercy to amend was error.