440 So.2d 1242 (1983)
David Ross DELAP, Appellant,
v.
STATE of Florida, Appellee.
No. 56235.
Supreme Court of Florida.
September 15, 1983.
Rehearing Denied December 14, 1983.
*1245 Richard L. Jorandby, Public Defender and Margaret Good, Asst. Public Defender, Fifteenth Judicial Circuit, West Palm Beach, for appellant.
Jim Smith, Atty. Gen. and Max Rudmann, Asst. Atty. Gen., West Palm Beach, for appellee.
ADKINS, Judge.
Appellant (David Ross Delap), hereinafter referred to as defendant, was adjudged guilty of murder in the first degree and, as recommended by the jury, sentenced to death. This appeal resulted. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Defendant was first convicted and sentenced to death in Okeechobee County in 1976. His conviction was reversed because of the state's inability to provide a sufficient transcript for appellate review. Delap v. State, 350 So.2d 462 (Fla. 1977). After remand, venue was changed to Orange County.
Sometime after 4:00 p.m. on June 30, 1975, the victim, Paula Etheridge, went to a laundromat to wash her clothes. She was wearing a red top and shorts. The next day the sheriff's office received a report that she was missing.
Between 5:30 and 6:00 p.m. on June 30, 1975, Ava Leonard and her daughter saw a slow-moving car with the front passenger door open traveling on Highway 70. The car swerved into the Leonard yard. A girl wearing a red top and "tan or brown" shorts was hanging out of the door of the car, screaming, "Help me, God, somebody help me." A man was holding her by the neck so she would not jump.
Lois Huff testified that on June 30, 1975, between 5:15 and 6:30 p.m. while driving east on Highway 70 with her three daughters, she noticed something unusual in her rearview mirror. The car behind hers contained a man and woman who were struggling. The man was holding the woman's *1246 head in the crook of his arm. Ms. Huff was behind a Walpole truck and all three vehicles were going in the direction of West Palm Beach. Ms. Huff stopped at a service station to call the sheriff. When no one responded within a few minutes, she tried to overtake the car. Although she drove all the way to West Palm Beach and did not pass the Walpole truck, she did not find the car.
The Walpole truck driver, Willy Kelly, saw a 1975 Plymouth or Dodge of faded color proceeding at approximately forty to fifty miles per hour. He saw an arm that was not moving hanging out the passenger door. Kelly slowed to see what was happening and the car took a left turn. He saw the passenger door come all the way open and a man stopped the car right after the turn in the middle of the road. The man got out and walked around the car, as Kelly drove on to West Palm Beach.
Jo Randolf, at the time a student at Okeechobee Community College, knew the defendant. On June 30, 1975, she saw defendant after 5:00 p.m. prior to a class she had with him. Defendant left but returned after class began, during the break. When defendant returned he had blood on his shirt. She overheard defendant say his child had been in an accident and that defendant had taken the child to a hospital for medical assistance. Defendant said the blood on his shirt came from the child's cut.
When a missing person report was received on July 1, 1975, Lt. Arnold investigated the report of a man and woman struggling in a car. Defendant's car was pointed out to him by Lois Huff and the car was placed under surveillance. State attorney investigator Brumley was told defendant's car fitted the description of the auto observed by witnesses as being involved in the disappearance. Brumley investigated defendant's background and obtained additional information. On July 7, 1975, Brumley sought to discuss the case with defendant. Brumley confronted defendant with the fact that he matched the description of the man seen struggling with a female and that his car matched the description given by witnesses. Defendant was also confronted with the fact that blood had been seen on his shirt the same evening and that his claim that between 6:00 and 8:00 p.m. he had taken one of his children to the hospital in Sebring, 52 miles away, had the child treated, and returned to the college was incredible.
Defendant agreed to accompany Lt. Arnold and Investigator Brumley to the sheriff's office, where he was questioned. Eventually the defendant gave a statement and took the officers to the place where he had hidden the victim's body.
In his first issue, defendant contends that his attorney-client privilege was violated when, at his first suppression hearing prior to the first trial, the trial judge overruled his objection to a question propounded to public defender investigator Coppock. At the hearing defendant called Coppock to testify in his attempt to suppress the confession. The defense established that Coppock, a trained polygraph examiner, examined the defendant. The purpose of the polygraph examination was to determine whether defendant had been given Miranda warnings and whether he had been promised psychiatric help prior to his confession. The state's objection to the introduction of the polygraph examination was sustained.
Defense counsel then proceeded to elicit from the witness Coppock that during the polygraph examinations, pursuant to questions, defendant denied making any statement that he had not been offered psychiatric help or that he had been advised of his rights. On cross examination the prosecutor asked Coppock whether he had asked defendant about a statement wherein defendant told chief of police Statts that he confessed because he trusted and liked Chief Statts. The objection of defendant to this question was overruled. Defendant now claims that the court's failure to sustain these objections was a violation of confidential attorney-client communications.
The prosecution may not make the defense counsel's investigator a state witness so that the accused's confidential communication to his attorney's investigator *1247 are exposed in the courtroom and used by the state against the defendant. As with all privileged communications, the justification for the privilege lies not in the fact of communication, but in the interest of the persons concerned that the subject matter should not become public. But when a party himself ceases to treat the matter as confidential, it loses its confidential character. Savino v. Luciano, 92 So.2d 817 (Fla. 1957). See Tibado v. Brees, 212 So.2d 61 (Fla. 2d DCA 1968); Soler v. Kukula, 297 So.2d 600 (Fla. 3d DCA 1974). Defendant sought to elicit from Investigator Coppock only testimony which would aid him in having the confession suppressed, while selectively blocking inquiries concerning his state of mind at the time of the confession which were not beneficial to his cause. The trial judge properly overruled defendant's objection to the question.
At the hearing on defendant's motion to suppress statements and confessions, defendant attempted to introduce Coppock's testimony on the results of a polygraph examination administered to the defendant. The state objected on the ground that such testimony was incompetent and wholly inadmissible. The rule that polygraph evidence is inadmissible is well established in Florida. Zeigler v. State, 402 So.2d 365 (Fla. 1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982); Sullivan v. State, 303 So.2d 632 (Fla. 1974), cert. denied 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976); Kaminski v. State, 63 So.2d 339 (Fla. 1952). Such evidence is admissible where the parties stipulate or agree to its admissibility. Anderson v. State, 241 So.2d 390 (Fla. 1970), vacated, 408 U.S. 938, 92 S.Ct. 2868, 33 L.Ed.2d 758 (1972); State v. Brown, 177 So.2d 532 (Fla. 2d DCA 1965). Defendant challenges this stipulation or consent requirement as an arbitrary evidentiary rule which operates to deny him a full and fair hearing on the voluntariness of his confession by preventing him from adducing important favorable evidence regarding the effect of the officer's interrogation tactics.
Where evidence is based solely upon scientific tests and experiments, it is essential that the reliability of the test be recognized and accepted by scientists or that the demonstration pass from the stage of experimentation to that of reasonable demonstrability. Rodriguez v. State, 327 So.2d 903 (Fla. 3d DCA), cert. denied, 336 So.2d 1184 (Fla. 1976). Polygraph testing has not passed the reliability threshold. State v. Curtis, 281 So.2d 514 (Fla. 3d DCA 1973), cert. denied, 290 So.2d 493 (Fla. 1974).
The use of a polygraph examination as evidence is premised on the waiver by both parties of evidentiary objections as to lack of scientific reliability. The evidence fails to show that the polygraph examination has gained such reliability and scientific recognition in Florida as to warrant its admissibility. The Florida rule of inadmissibility reflects state judgment that polygraph evidence is too unreliable or too capable of misinterpretation to be admitted at trial. However, the court does recognize that the parties may waive their evidentiary objection. Defendant's constitutional rights have not been violated by the exclusion of inadmissible polygraph evidence.
Defendant contends that the trial judge committed error when he admitted defendant's confession into evidence, arguing that the confession should have been suppressed on the grounds that it was coerced and that it was the fruit of an illegal search.
After a week's investigation of the victim's disappearance, state attorney investigator Brumley and Deputy Arnold approached Delap at the community college before 9:00 p.m. on July 7, 1975. The officers had already secured search warrants for Delap's home and car from a county judge. The defendant was not informed of this when he agreed to accompany Arnold and Brumley to the sheriff's office. The evidence is sufficient to sustain the finding of the trial judge that defendant was fully apprised of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The evidence clearly shows that defendant understood these rights.
*1248 Defendant points out that if the accused requests an attorney, the interrogation must cease until an attorney is present. Defendant claims that he asserted his right to counsel by informing the interrogating officers that he was already represented by the public defender's office. This representation was in an unrelated matter. Defendant's statement that he was represented in another matter does not constitute a demand for the presence of an attorney in the matter at hand.
The right to counsel during questioning can be waived. Witt v. State, 342 So.2d 497 (Fla.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). Investigating officers are not required to try to convince a defendant that he needs an attorney. Palmes v. State, 397 So.2d 648 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); State v. Craig, 237 So.2d 737 (Fla. 1970).
On cross examination, in response to the question, "Did you ever at any time ask to call a lawyer?", the defendant replied, "A lawyer didn't enter my mind." Apparently the defendant never requested counsel despite his understanding of his rights. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), relied upon by defendant, involved a situation where the accused invoked his right to counsel during interrogation, interrogation ceased, the next morning the defendant told a detention officer he did not wish to speak to anyone, the officer told accused he had to, and the accused thereafter was interrogated again. Edwards v. Arizona is inapplicable because here the defendant voluntarily agreed to the questioning and did not invoke his right to counsel upon being informed of his rights.
When defendant accompanied the officers to the sheriff's office, Investigator Brumley made arrangements for Florida Department of Criminal Law Enforcement agent Buchannan to execute a search warrant on the home of defendant. Brumley instructed Buchannan to determine if any of defendant's children had injuries to their hands and if there was any digging around defendant's house or shed. Brumley interrupted the interrogation to call Buchannan at defendant's house and learned that as a result of the search they found no digging nor injuries to the children's hands. While he was out of the interrogation room for the purpose of calling Buchannan, Brumley also called police chief Statts to join the interrogation because he was a friend of defendant's. After Brumley returned to the interrogation room and after Chief Statts arrived, Brumley confronted defendant with the information derived from Buchannan and for about twenty minutes continued to point out that defendant was lying. Defendant then confessed to killing the victim because he was mad.
The search warrant authorizing Buchannan to search the defendant's home was declared invalid. Defendant argues that the confession was the product of a search made pursuant to an invalid search warrant. In support of his contention, defendant cites Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), where the Supreme Court held that the rule excluding evidence obtained by an unlawful search bars from trial not only physical, tangible materials obtained either during or as a direct result of an unlawful invasion, but also verbal evidence, such as declarations made by the accused. The question to be determined is whether defendant's incriminating statements were induced by Brumley's use of information secured by the officers searching defendant's home.
Prior to the questioning and search of defendant's home, Investigator Brumley was in possession of circumstantial evidence implicating defendant in the crime. Brumley knew defendant owned an automobile which fit the description of an automobile observed by witnesses to be involved in the disappearance of the victim. Defendant matched the description of the suspect seen struggling with the victim. Defendant had been observed at the junior college with blood on his shirt the evening of the crime. He had explained that the blood came from one of his children who had been injured *1249 and taken to the hospital. Defendant had left the community college at 6:00 p.m. and returned at 8:00 p.m., and he had claimed that he had taken the child to the Sebring hospital. Investigator Brumley knew that it was impossible to get to Sebring hospital, fifty-two miles away, have the child treated and return within two hours.
From the preliminary questioning, Investigator Brumley knew that defendant could not verify where he was between 6:00 and 8:00 p.m. through a witness. Defendant gave his consent for a search of his car and the search revealed apparent blood stains and footprints on the passenger door front side and a shovel.
On cross examination defendant was asked whether the fact that his son's finger had not been cut made him confess. The defendant replied, "I don't know what made me confess." The confession began shortly after police chief Dewitt Statts joined the questioning. Chief Statts testified that defendant said he wouldn't have told the other investigators anything, "But I know you. I go to church with you, and he said I like you and I trust you. And he said I'm willing to tell you what happened."
We agree with the trial judge that the evidence clearly shows the voluntary nature of the statement. It then became necessary for defendant to raise the search and seizure issue by showing that the allegedly tainted statement was the product of the unlawful search and seizure.
The exclusionary rule operates against evidence seized and information acquired during an unlawful search as well as against derivative evidence. However, it does not follow that such evidence or information is rendered forever unusable. In Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the United States Supreme Court was confronted with a conviction of a corporate defendant for contempt arising out of the failure to comply with a subpoena for the production of certain corporate records. The defendant had earlier established that these records were in the possession of the government as a direct result of an unlawful seizure, and so the records had been returned by court order. The government officials, however, made copies of the records and used the copies as the basis for the issuance of a subpoena for the originals. The court set aside the contempt conviction on the ground that the subpoena was a product of the prior illegal seizure, saying:
The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.
251 U.S. at 392, 40 S.Ct. at 183.
In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the court set forth the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest or search should be excluded. Federal agents solicited an oral statement from defendant Toy after forcing entry at 6:00 a.m. at the laundry at the back of which he had his living quarters. The entry was illegal. Toy's statement, which bore upon his participation in the sale of narcotics, led the agents to question another person, Johnny Yee, who actually possessed the narcotics. Yee stated that heroin had been brought to him earlier by Toy and another Chinese known to him only as "Sea Dog". Toy said that "Sea Dog" was Wong Sun. Toy led agents to a dwelling where, he said, Wong Sun lived. The agents gained admittance to the building and brought Wong Sun out in handcuffs. After arraignment, Wong Sun was released on his own recognizance. Several days later he returned voluntarily to give an unsigned confession.
The Supreme Court ruled that Toy's declarations and the contraband taken from Yee were the fruit of the agents' illegal action and should not have been admitted *1250 as evidence against Toy. The Court held that the statement did not result from "an intervening independent act of a free will", and that it was not "sufficiently an act of free will to purge the primary taint of the unlawful invasion". 371 U.S. at 486, 83 S.Ct. at 416. With respect to Wong Sun's confession, however, the Court held that in light of his lawful arraignment and release on his own recognizance, and of his return voluntarily several days later to make the statement, the connection between his unlawful arrest and the statement "had become so attenuated as to dissipate the taint". 371 U.S. at 491, 83 S.Ct. at 419 citing Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In its opinion the Court said:
We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).
371 U.S. at 487-8, 83 S.Ct. at 417.
The issue involved in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), was whether statements were to be excluded as the fruit of an illegal arrest or were admissible because the giving of the Miranda warning sufficiently attenuated the taint of the arrest. Defendant was arrested without probable cause and without a warrant. He was given the warnings prescribed by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thereafter, while in custody, he made two inculpatory statements. The Court observed that the exclusionary rule protects fourth amendment rights while a Miranda warning protects fifth amendment rights. Thus, even if statements were found to be voluntary under the fifth amendment, the fourth amendment issue could still remain. In its opinion, the Court said:
It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.
422 U.S. at 603, 95 S.Ct. at 2261 (citation omitted) (emphasis in original).
The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v. Louisiana, 406 U.S. 356, 365, 32 L.Ed.2d 152, 92 S.Ct. 1620 [1626] (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. See Wong Sun v. United States, 371 U.S., at 491, 9 L.Ed.2d 441, 83 S.Ct. 407. The voluntariness of the statement is a threshold requirement. Cf. 18 U.S.C. § 3501 [18 USCS § 3501]. And the burden of showing admissibility rests, of course, on the prosecution.
422 U.S. at 603-4, 95 S.Ct. at 2261-2 (footnotes omitted).
The courts do not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal action of the police. The more apt question is whether, granting the establishment of the primary illegality, the *1251 evidence to which instant objection is made has been come at by exploitation of that illegality or instead by being sufficiently distinguishable to be purged of the primary taint. This standard incorporates both the "independent source" and the "attenuated connection" limitations to the fruit of the poisonous-tree doctrine. See Annot., 43 ALR 3d 385 at 391 (1972).
It is well to consider a few samplings of the many judicial statements and applications of these rules:
Of course a witness' identity may be derived solely or principally from illegally obtained evidence and warrant a court in disallowing his testimony. But the taint of the unlawful search may be removed if there are independently sufficient "leads" by which the government may discover the identity.
United States v. Resnick, 483 F.2d 354, 357 (5th Cir.), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973) (citations omitted).
As to appellants' first point, it is well established that the fruit of unlawful evidence may nevertheless be admitted if the government demonstrates that the evidence would have come to its attention from an independent source. Here, even if the statement obtained from Vivienne Nagelberg in Canada were properly suppressed, there existed a number of independent sources of information which would have led the government to Benichou... . Any taint that may have existed was therefore removed. .. .
United States v. Nagelberg, 434 F.2d 585, 587 (2d Cir.1970), cert. denied, 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971) (citations omitted).
[Unlawful arrests led to information about stolen money orders, but, police also had adequate lawful information which would have led to investigation and the same discovery.] Certainly, the unlawful arrests did not serve to immunize the appellants from prosecution.
United States v. Hoffman, 385 F.2d 501, 503-4 (7th Cir.1967), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968).
[A homicide victim's body was located through an invalid confession.] The mere fact that the body was discovered at the particular time it was discovered because of Killough's disclosure of its whereabouts in his illegally secured confessions is not determinative. We cannot conclude here ... that the body would not have been discovered "but for" Killough's confession, having regard to the evidence here.
Killough v. United States, 336 F.2d 929, 934, (D.C. Cir.1964) (citations omitted).
Since the search was illegal, and defendant has introduced substantial evidence showing that the heroin and the letter were uncovered as a result of this illegal search, the burden shifted to the government, which then was under an obligation to prove that its evidence had an independent origin. Had the government shown that it had knowledge of the secret compartment from an independent source, the evidence would of course have been admissible.
United States v. Paroutian, 299 F.2d 486, 489 (2d Cir.1962) (citations omitted).
Even appellant's counsel admitted that in the normal course of investigation the police would have discovered the existence of Gerchak as a witness. Under the circumstances, it is clear that the testimony of Gerchak would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint. The locating of the witness would not have remained unknown "but for" the confession.
Santiago v. State, 444 S.W.2d 758, 761 (Tex. Cr.App. 1969) (citations omitted).
To accept defendant's contention in regard to this evidence, it would be necessary to assume that but for the improper arrest the state never would have been able to discover the location of the cattle, photograph them, and locate the stock yard records. We must reject this conclusion since it seems quite apparent that even without the arrest of the defendant at that particular time and place, the *1252 state would have been able to locate the stolen cattle otherwise. There is nothing so unique about the weigh bill offered by the defendant or his admissions to the officers to indicate that this alone was the only source to the evidence which was subsequently admitted at the trial.
Pfeifer v. State, 460 P.2d 125, 127 (Okla.Cr. App. 1969).
[T]he courts have held that evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence.
People v. Fitzpatrick, 32 N.Y.2d 499, 506, 300 N.E.2d 139, 141, 346 N.Y.S.2d 793, 797, cert. denied, 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338 (1973).
In one situation it is relatively simple to determine that a voluntary statement or confession of the defendant is the product of an illegal search. For example, an individual who is present while his home is being searched makes remarks to the searchers during course of the search. Clearly, any such remarks are the result of the search and, if the search is declared illegal, are tainted by it. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This is not the situation in the case sub judice.
If a defendant establishes that he was the victim of an illegal search or seizure, that within a reasonable time thereafter he was interrogated about an offense to which the illegal act was relevant, and that such interrogation resulted in his making a statement, the defendant has made a prima facie showing that the confession was the product of and tainted by the illegal act. The confession, of course, would be inadmissible unless the prosecution removes the taint by showing that the illegal act was not the sole effective cause of the confession. For example, if the search had been completely fruitless, producing no information whatever, there could be no causal connection between the search and the confession.
In the case sub judice the search did result in the discovery of evidence incriminating to the defendant. The prosecution established that they were interrogating defendant on the basis of information already in their possession from lawful sources. Even if the search had not occurred, they would have interrogated the defendant concerning the identical incriminating evidence which the illegal search produced, as the police officers also secured this information from lawful sources. Such a showing by the prosecution eliminates illegal search as the sole producing agent of the interrogation itself and the confession was properly held not to be tainted.
In Harlow v. United States, 301 F.2d 361 (5th Cir.), cert. denied, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962), the defendant was interrogated after federal agents illegally intercepted certain letters. The court said that any taint upon the defendant's confession resulting from this illegal interception was removed by prosecution evidence that, prior to the interception, the agents had information which in and of itself warranted the interrogation. The court said: "The investigating agents were not forever precluded from interrogating McLane and pressing him to confess merely because they thereafter illegally seized other evidence tending to implicate McLane in the bribery scheme." 301 F.2d at 373.
Defendant has established that the interrogators made use of illegally obtained information during the interrogation. This is not a situation where the officers displayed to the defendant highly incriminating items with a demand that he explain his possession of them, nor was it a situation where the officers used information gained during the search as the sole basis for questioning. The presence or absence of this factor is highly significant in determining whether the confession is tainted.
Admittedly, some improperly obtained information was used. In such a situation the confession bears the same *1253 taint as the illegal information and is inadmissible unless the prosecution can establish that such use was not the sole effective cause of the confession being made. It can discharge this burden by showing that the confession had another, and lawful, cause.
For example, in United States v. Rutheiser, 203 F. Supp. 891 (S.D.N.Y. 1962), a defendant claimed that his confession to the possession of stolen goods was tainted because his interrogators made use of their knowledge that the goods had been found in his home during an illegal search. The court was able to find that the confession was the product not of this circumstance but, rather, of the confrontation of the defendant by the one who sold the goods to him. "This statement has no apparent connection with the illegally seized evidence and stems from Rutheiser's alleged purchase of stolen goods from Jones. This statement was based upon facts developed independently of the illegal search... ." 203 F. Supp. at 893-4.
It is necessary for the defendant to establish only a probable causal connection between the illegal act and the proffered statement or confession. The prosecution must then assume the burden of proving that the illegal act was not the sole effective cause of the acquisition of the evidence or statement. The crucial factor in resolving the issue of what in fact caused the defendant to make his statement is his own motive. The issue is what motivated the accused to confess. The prosecution need establish only that the tainted information or evidence probably was not the sole effective cause of the accused's confession, and the defendant then has the burden of proving otherwise. The confession is never admissible unless the prosecution establishes it was made voluntarily by the accused. Such a showing is a factor in and of itself to show that the confession was not the product of the tainted evidence. The accused is the best witness as to his own motives, and there is no injustice in a rule which requires him, in this limited area, to prove what his motive was in confessing if he wishes to invoke the strong medicine of the exclusionary rule. See Maguire, How to Unpoison the Fruit, 55 J.Crim.L., Criminology, and Police Sci. 307, 321 (1964). Defendant certainly has not sustained this burden.
Defendant contends that the trial court committed reversible error when it overruled his objection to Dr. Schofield's opinion concerning the cause of death of the victim, arguing that the expert can only present an opinion when it is expressed in terms of "reasonable medical certainty". He relies on Fisher v. State, 361 So.2d 203 (Fla. 1st DCA 1978), and Wright v. State, 348 So.2d 26 (Fla. 1st DCA), cert. denied, 353 So.2d 679 (1977). In Fisher and Wright, convictions were reversed because the evidence adduced in each one of these cases was beyond the expertise of the expert witness. In a criminal case expert medical opinion as to cause of death does not need to be stated with reasonable medical certainty. Such testimony is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death. See Copeland v. State, 58 Fla. 26, 50 So. 621 (1909); Hampton v. State, 50 Fla. 55, 39 So. 421 (1905); 24 Fla.Jur.2d Evidence and Witnesses § 683 (1981); Smith and Tipton, Reasonable Medical Certainty in Florida, 30 Fla.B.J. 327 (May 1956).
In Clemons v. State, 48 Fla. 9, 37 So. 647 (1904), a homicide case, it was held that the trial court did not commit error in overruling an objection to a question asked by the state attorney: "Doctor, in your opinion, as a physician, could the wound have been produced by a naked fist?". Even though the state may be required to prove the cause of death beyond a reasonable doubt, this does not mean that every link in the chain of evidence must be so proved. To be admissible, a medical expert's opinion as to the cause of an injury or death does not have to be expressed in terms of a reasonable medical certainty. Such evidence is admissible, but the weight to be given it is a matter to be determined by the jury. See Holland v. State, 359 So.2d 28 *1254 (Fla. 3d DCA 1978), cert. denied, 367 So.2d 1124 (Fla. 1979). This contention of the defendant is without merit.
The trial court properly denied defendant's request to instruct the jury on the maximum and minimum sentences for lesser included offenses of first-degree murder. Tascano v. State, 393 So.2d 540 (Fla. 1980), does not require that a jury be instructed on the penalty for lesser included offenses. James v. State, 393 So.2d 1138 (Fla. 3d DCA), review denied, 402 So.2d 610 (Fla. 1981). The instructions to the jury were in writing as required by Florida Rule of Criminal Procedure 3.390(b). Defendant requested that they be sent with the jury when the jury retired to deliberate. The trial judge denied the request but stated that if the jury came back with a question all of the instructions would be furnished to the jury. Florida Rule of Criminal Procedure 3.400 gives the trial court discretion in determining whether the instructions should be sent to the jury room when the jury retires for deliberation. Defendant argues that the requirement of delivery to the jury so that they could have the written instructions during deliberations was a mandatory duty. The rule makes it clear that it is in the sound discretion of the trial court to determine whether written instructions should be carried in their written form by the jury to the jury room for use during its deliberations. Matire v. State, 232 So.2d 209 (Fla. 4th DCA 1970). Defendant has failed to show an abuse of discretion.
The standard jury instructions were given to the jury. Defendant contends that the trial court committed error when it denied a requested instruction that mitigating circumstances other than the statutory ones could be considered. Defendant relies upon Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). It does not appear that the trial judge precluded defendant from offering any evidence of non-statutory mitigation. The trial judge correctly ruled that the standard jury instruction adequately covered the instructions on mitigating circumstances. Buford v. State, 403 So.2d 943 (Fla. 1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1039, 71 L.Ed.2d 320 (1982).
We now consider the propriety of the imposition of the death sentence. This sentence concurred with the recommendation of a majority of the trial jurors. The trial judge made the following findings:
AGGRAVATING CIRCUMSTANCES
(a) The capital felony was committed by a person under sentence of imprisonment in that the Defendant was convicted of the felony of "unarmed robbery and an assault with intent to commit rape", and under sentence and parole therein. For details see State's exhibits in evidence # 25 and # 26.
(b) The Defendant was previously convicted of another felony involving the use or threat of violence to the person, said felony being the same felony referred to in paragraph (a) above.
(c) The Defendant knowingly created a great risk to many persons when he drove down Highway # 70 with one arm on the wheel of the automobile in question and the other arm holding the victim in such a manner as to allow her to hang out the banging open door of the vehicle. This reckless driving could easily have resulted in a collision with either another vehicle or a school bus resulting in death to many persons.
(d) The capital felony was committed while the Defendant was engaged in the commission of a kidnapping, robbery, and rape.
(e) The capital felony was committed for pecuniary gain.
(f) The capital felony was especially cruel.
MITIGATING CIRCUMSTANCES
(a)  (g) none
(h) The Defendant's behavior at his second trial and during his stay on death row (as determined by the court's own personal investigation) was acceptable. Perhaps there was some remorse. It is unfortunate that the law upon the conviction *1255 of the first offense does not allow for castration in cases of this nature for then neither the school teacher nor the defendant would be in their current predicament.
This Court finds from the evidence the aggravating circumstances exceed the mitigating circumstances in this case, thus warranting both the jury and the Court's death sentence.
The state adduced evidence that defendant had been charged in Michigan with rape and armed robbery and that he had pled guilty to the reduced charges of unarmed robbery and assault with intent to commit rape. The defendant argues that the court committed error in allowing evidence to be admitted which showed the use or threat of violence to the person during commission of the unarmed robbery and assault with intent to commit rape. The state contends that this evidence was relevant to prove an aggravating circumstance. This procedure was approved in Elledge v. State, 346 So.2d 998 (Fla. 1977). We held it proper to permit the state to adduce the testimony of the widow (Mrs. Nelson) of a murder victim whose murder had been used to support a finding that the defendant had been previously convicted of a violent felony. We said:
The question then arises whether it was proper to permit Mrs. Nelson to testify concerning the events which resulted in the conviction as opposed to restricting the evidence to the bare admission of the conviction. We conclude it was appropriate to admit Mrs. Nelson's testimony. This is so because we believe the purpose for considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case. Propensity to commit violent crimes surely must be a valid consideration for the jury and the judge. It is matter than can contribute to decisions as to sentence which will lead to uniform treatment and help eliminate "total arbitrariness and capriciousness in [the] imposition" of the death penalty. Proffitt v. Florida, supra, 96 S.Ct. at 2969.
Our conclusion in this regard is buttressed by the language of the statute: "... In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (6) and (7). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitutions of the United States or of the State of Florida... ." (Emphasis supplied) § 921.141(1), Fla. Stat.
346 So.2d at 1001-02. If a defendant was previously convicted of any violent felony, any evidence showing the use or threat of violence to a person during the commission of such felony would be relevant in a sentence proceeding.
At defendant's first trial, the trial judge "found the evidence at trial insufficient to support a felony murder basis for conviction." The present trial was not submitted to the jury on the phase of felony murder, but at the penalty phase the state argued that the offense was committed during a rape, robbery or kidnapping. Defendant argues that the resubmission of this issue constituted double jeopardy and relies upon Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). In Bullington, the defendant was originally tried for murder and convicted. In a separate sentencing phase the jury fixed his punishment at life imprisonment. Subsequently, defendant sought a new trial and his motion was granted. The Missouri authorities notified him that the state would seek the death penalty at the new trial. On these facts the Supreme Court held that it was a violation of the double jeopardy clause of the constitution to seek to impose *1256 the death penalty since a jury had already acquitted the defendant of whatever was necessary to impose a death sentence.
In contrast to Bullington, the defendant here was not acquitted of whatever was necessary to impose the death sentence at his first trial and sentencing hearing. There the trial court, accepting the jury's recommendation, sentenced defendant to death in the first proceeding. The double jeopardy clause does not bar the state from adducing evidence necessary to demonstrate that the death penalty is appropriate in this trial just as it does not preclude the state from re-trying a defendant who has succeeded in overturning his conviction for trial error. See United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).
The defendant argues that there was a doubling-up of the same aggravating circumstance, as the trial judge found that the capital felony was committed by a person under sentence of imprisonment and that the defendant was previously convicted of another felony involving the use of violence. He relies upon the principles set forth in Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). In Provence, we held that the commission of a capital felony in the course of a robbery and the commission of a capital felony for pecuniary gain would constitute only one aggravating factor, since both aggravating factors referred to the same aspect of the defendant's crime. However, the aggravating factors of being under sentence of imprisonment and being previously convicted of another felony involving violence do not cover the same aspect of the defendant's criminal history. The defendant could be under a sentence of imprisonment without having been convicted of a felony involving violence. Also, a defendant could be convicted of a felony involving violence without being under a sentence of imprisonment. These aggravating circumstances are separate, and including the two factors in the weighing process does not constitute a doubling of aggravating circumstances.
The court's finding that the murder was committed while defendant was under sentence of imprisonment is fully supported by evidence that he was on parole from prison for offenses committed in Michigan. See Straight v. State, 397 So.2d 903 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981). The court's finding that defendant had been previously convicted of a felony involving the use of force is supported by the same evidence.
The court's finding that defendant created a great risk of death to many persons is supported by evidence that defendant drove erratically presenting a danger to lives of motorists on a highway while he was struggling with the victim. It is only conduct surrounding the capital felony for which defendant is being sentenced which properly may be considered in determining whether defendant "knowingly created a great risk of death to many persons." Mines v. State, 390 So.2d 332 (Fla. 1980), cert. denied, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308 (1981); Elledge v. State, 346 So.2d 998, 1004 (Fla. 1977).
In Kampff v. State, 371 So.2d 1007 (Fla. 1979) and Lewis v. State, 377 So.2d 640 (Fla. 1979), only two persons other than the deceased were present during the commission of the homicide. The court pointed out that the risk of death created by the capital felon's actions must be "many" persons, and a great risk of death to a small number of people would not establish this aggravating circumstance.
In King v. State, 390 So.2d 315 (Fla. 1980), cert. denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981), we held that by setting fire to the house in which the victim resided and in which no other person was present, the defendant knowingly created great risk to many persons because he should have reasonably foreseen that the blaze would pose a great risk to the neighbors as well as the firefighters and the police who responded to the call. In Welty v. State, 402 So.2d 1159 (Fla. 1981), we held that by setting fire to a building the defendant posed a direct threat of death to six elderly persons residing *1257 in the building as well as the neighbors, firefighters, and police responding to the call. In each instance, we sustained the trial court's finding that defendant created a great risk of death to many persons.
In the case sub judice the struggle with the victim was clearly conduct surrounding the capital felony. There were numerous vehicles on the highway and defendant should have reasonably foreseen that his erratic driving and possible loss of control of the car would have created a "great risk" of danger to many persons, including the risk of crashes, possible harm to neighbors, and to police responding to the scene.
The evidence fully supports the finding that the murder occurred while defendant was engaged in commission of a kidnapping, robbery, and rape. The victim was abducted at knife-point from the laundromat and taken by defendant in his car. Although she was wearing a red top when she left for the laundry, she only had shorts on when her body was recovered. Defendant also took the victim's pocketbook and buried it. This evidence is insufficient to support the finding that the felony was committed for pecuniary gain.
Evidence of the victim's kidnapping, her struggle, her pleas for help, and the extremely cruel beating and strangulation death supports the finding that the murder was extremely cruel, heinous, and atrocious.
The court considered defendant's contention that he was acting under extreme emotional duress and properly rejected it, as did all three psychiatrists who examined defendant.
Before imposing sentence, the trial judge visited Florida State Prison to determine if defendant's conduct on death row constituted a mitigating circumstance. Defendant says this violates the principles of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). It does. However, as the result of this investigation the trial judge found a non-statutory mitigating factor which he considered in imposing sentence. This error did not injuriously affect the substantial rights of the defendant.
The facts supporting the sentence of death are clear and convincing and are established beyond a reasonable doubt. We have carefully examined the record in this case and considered the brief of the defendant. Defendant has had a fair trial and other questions presented by him in the brief are without merit.
It is therefore our opinion the judgment and sentence should be affirmed.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and EHRLICH, JJ., concur.