## STATE OF FLORIDA v. TUCKER

Case No. 84-4088 CF

Seventeenth Judicial Circuit, Broward County

September 6, 1984

### APPEARANCES OF COUNSEL

**Michael J. Satz,** State Attorney's Office for plaintiff.

**Charles H. Vaughan** for defendant

### ORDER ON MOTION TO SUPRESS

ORDER ON MOTION TO SUPRESS

J. LEONARD FLEET, Circuit Judge

Defendant, Allen Wayne Tucker, has filed with this Court a motion designed to suppress incriminating statements allegedly made by him to

law enforcement officers after he was in custody and tangible evidence was discovered with his assistance after the complained of statements were made. The issues to be resolved in this proceeding have been clearly delineated by the Motion to Suppress filed by the accused and the response thereto submitted on behalf of the State of Florida. The Court, on August 30 and 31, 1984, heard testimony—over a period of approximately ten hours—of all those witnesses deemed relevant by both the prosecution and the defense. In addition to the foregoing assistance, the Court has had the opportunity to conduct its own research upon the relevant issues. It is upon the foregoing experiences that this Court now enters its Order on Defendant's Motion to Suppress.

### FACTUAL SUMMARY

Defendant, approximately 23 years of age when the instant events occurred, resided with his parents and numerous siblings upon what has been termed the "Meekins Quarry" located in the northern part of Broward County off Powerline Road. Upon this property James Tucker, the father of the accused, has operated a dragline for approximately fourteen years, thereby creating a large lake. Around the perimeter of the lake is a dirt road that, in turn, is surrounded by a rather large area of undeveloped property. As it is not unusual in an urban area where a large expanse of land is found to exist, the site of the lake has become known as a trysting place for those who seek romantic solitude. The discouragement of nocturnal human visitors was one of the responsibilities placed upon the shoulders of James Tucker, in consideration of which he was provided with a home in which to house his family.

In the darkness of the night of April 9-10, 1984, Allen Tucker came upon the decedents while they were nude and engaging in sexual intercourse in the cab of the truck of the male decedent. What happened next is the subject of some dispute as to the particulars, but it cannot be denied that the two decedents soon met their death as a result of several gunshot wounds.

After the shooting, Allen Tucker returned to his home and awakened his brother, Tommy, who slept in a small trailer located immediately behind the home of their mutual parents. Upon being informed by Allen that the shootings had occurred, Tommy went to the scene with Allen. Allen requested that Tommy render the assistance necessary to place the bodies of the decedents inside the cab of the truck and to then push the truck into the artificial lake so patiently dug by their father, James, during his many years with Meekins. Tommy

**33**

refused to cooperate with his brother and the two of them then swiftly returned to the family home in order to seek the advice of their father.

When James Tucker was informed of the events above described, he quickly made arrangements for a family friend, Ed Kersey, to purchase a ticket to Chicago for Allen, utilizing the credit card of Mr. Kersey. Allen was to meet his brother, Leonard Tucker, in Chicago and to remain there until the family could sort out this sudden drama and determine upon a course of action. Allen was driven to the Ft. Lauderdale/Hollywood International Airport by Mr. Kersey, accompanied by Mrs. Tucker and one of the sisters of the accused. While Allen was en route to the airport, James threw the rifle utilized in the subject homicide into the man made lake.

Allen arrived in Chicago and was met at the airport by his brother, Leonard, as planned. Upon arrival at the home of Leonard, Allen rested, without sleeping, but did not consume much food. A telephone conversation was had later in the day with his father during the course of which it was determined that Leonard and Allen would return to Ft. Lauderdale for the purpose of arranging for an attorney and to effectuate the surrender of the accused. It was also discussed, during this same telephone conversation, that James, Leonard and Tommy would also surrender themselves in reference to any criminal charges that may be brought against them for having rendered aid to Allen.

Upon their return, Leonard and Allen took a taxicab to the Days Inn Motel located at the intersection of Hillsboro Boulevard and I-95 in Deerfield Beach, a location not more than a ten minute automobile drive from the scene of the crime and the home of their parents. Leonard registered the room in his name and then called his parents; during the course of this conversation he informed his sister, Jenny, that they were in town and gave her a telephone number where they could be reached. Apparently, the name of the motel was not included in the information furnished to Jenny by Leonard.

While all of the foregoing events were transpiring, other matters were taking place that would lead, ultimately, to the arrest of Allen for, and his indictment upon, charges of capital homicide.

The bodies of the decedents were discovered by some surveyors at or near 2:00 P.M. on April 10, 1984, (by which time Allen was in Chicago with Leonard). Acting in response to information furnished by the Deerfield Beach Police Department, officers of the Broward County Sheriff's Office were dispatched to the scene. Detectives Scheff and Amabile arrived at the scene of the crime about 3:15 P.M. The body of the male victim was noted to have air conditioning duct tape wrapped

34

around his head and mouth, his hands were loosely tied with light rope above his head and his body was partially under the cab of the truck. The body of the female victim was found face down with both a man's watch and a woman's watch on the wrist of one hand. Both of the bodies contained multiple bullet wounds.

Detectives Scheff and Amabile were required by their duties to depart the crime scene between 6:30 P.M. and 11:00 P.M. Upon their return, contact was made with Tommy Tucker who agreed to accompany them to the Broward County Sheriff's Office located in the southern part of Ft. Lauderdale off of State Road 84. At approximately 11:30 P.M. the interview with Tommy began and, because he felt that Tommy was not being candid with him, Detective Scheff informed him of his constitutional rights as dictated by *Miranda v. Arizona*, 384 U.S. 436 (1966). Upon the rights warning being given him (which occurred at approximately 12:25 A.M., April 11, 1984), Tommy Tucker gave information to Detective Scheff that implicated Allen Wayne Tucker as the person responsible for the deaths of the victims in this case. A taped statement to the same effect was furnished by Tommy to Detective Scheff at about 1:30 A.M., April 11, 1984, approximately three hours before Allen Wayne Tucker was arrested at the Days Inn Motel in Deerfield Beach.

Armed with the information furnished by Tommy, Detectives Scheff and Amabile returned to the home of James Tucker where they learned that Leonard and Allen were back in Broward County. It is at this point in time, 3:30 A.M., April 11, 1984, that Jenny Tucker furnished the detectives with the telephone number obtained from Leonard. A telephone call was made to the suspect number and the location of the motel was confirmed. Accompanied by James Tucker, the detectives drove from the Deerfield Beach Police Department. At or about the hour of 4:05 A.M., just two and one-half hours after learning, reliably, that Allen Wayne Tucker was the person whom they sought to arrest, Detective Scheff and his colleagues confirmed the presence of Leonard Tucker in room 279 of the subject motel. The detectives took up positions outside the door of room 279 and, pursuant to a prearranged signal, James Tucker made a telephone call, requested by the police, to awaken the occupants of room 279 and to request that they surrender peacefully.

Leonard Tucker, responding to the request of his father, exited room 279 and surrendered quietly while, at the same time, informing the detectives that his brother was inside the room and asleep. Detectives Scheff, Amabile and Gucciardo ran into room 279 where they observed the accused to be sleeping on the bed closest to the door, lying upon

**35**

his right side with his right hand and forearm underneath a pillow. One detective secured one arm and another secured the other arm, both with service guns drawn. Defendant Allen Tucker was awakened and arrested, with guns pointed at his head, at approximately 4:25 A.M. He was transported in a police vehicle, in restraints, to the Broward County Sheriff's Office where he was questioned by Detectives Scheff and Amabile.

According to the detectives, Allen was released from his restraints once he was inside the interrogation room, he was offered food and coffee and was given the opportunity to use the bathroom. Allen declined all the offered amenities after which he was informed of his constitutional rights by Detective Scheff who utilized the standard "Miranda" card issued by the Broward County Sheriff's Office. The rights warning was given at 5:00 A.M., immediately after entry into the interrogation room as above described.

It is the contention of the accused that he did not wish to speak to the law enforcement officers until after he had consulted with an attorney. The State contends that the defendant promptly waived the right to remain silent until after consultation with counsel. In fact, says the State, there was never any request made by the accused to consult with an attorney. In any event, regardless of the circumstances, Allen Wayne Tucker made statements that implicated himself in the deaths of the two decedents and later led the police to that part of the lake on the Meekins property from which the firearms and other tangible objects were recovered.

The issue to be resolved by the Court is whether the police created the exigent circumstances upon which they now seek to rely to justify their warrantless entry into room 279 of the Days Inn Motel and the warrantless arrest of the defendant therein. If the arrest was invalid, says the defense, all that followed thereafter was constitutionally infirm. Furthermore, alleges the defendant, this Court should suppress the incriminating statements made at the Broward County Sheriff's Office after the arrest, as well as the evidence recovered from the lake, because such information was obtained only after the accused had repeatedly asked for the presence of an attorney, which requests were just as repeatedly ignored by the police. Additionally, and finally, the accused seeks suppression of his statements upon an allegation that they were given as a result of police overreaching in that he was promised that no one in his family would be arrested if the accused made a full statement wherein he admitted his own guilt.

To the allegations made by the accused, the State responds with

complete denial of the charges of overbearing and unconstitutional conduct. The arrest was justified, given the nature of the homicide and their belief that Allen was still armed and probably dangerous. To have delayed the entry into the motel room and, concommitantly, the arrest of the defendant, for the several hours that it would have taken to obtain an arrest warrant would have meant the unnecessary exposure of innocent people to possible resistance by the accused at the time of his arrest. As regards the claim of overreaching and denial of counsel, the law enforcement officers flatly deny any such threats or promises as alleged by the accused. There was never any suggestion that any other member of Allen's family would be charged with any crime if Allen failed to admit his own guilt, nor was there ever any request for an attorney made in order to permit even a suggestion of denial of access thereto by the police.

## LEGAL ANALYSIS

Resolving the conflict between the parties testifying in this matter at first seemed quite difficult; upon reflection, however, the basis for resolution comes from the accused, his father and his brother Tommy. Each of the parties mentioned, during their testimony in support of the Motion to Suppress, stated that they wanted to talk to the police and resolve their legal exposure. James Tucker, the father of the accused, testified that he discussed with Leonard, while Allen was in Chicago, the fact that Allen wanted to turn himself in to the authorities. According to James, he agreed with the concept of surrender and Leonard was to accompany Allen back to Ft. Lauderdale for the express purpose of surrender. In fact, testified James Tucker, he wanted to contact the police as soon as he had learned of the homicide and his son's participation therein.

Tommy Tucker, during his cross examination by the State Attorney, admitted that he had decided as early as the afternoon of April 10, 1984, that he wanted to call the police and "get it over with." The same philosophy of admitting culpability pervades the testimony of Allen Wayne Tucker as given at the hearing upon his Motion to Suppress. Thus it is the conclusion of the Court that the statement of Allen Wayne Tucker, both electronically recorded and not electronically recorded, was a free and voluntary act. The Court also concludes that the directions given at the Meekins quarry, as the same related to the location of the various tangible objects retrieved therefrom, were freely and voluntarily given and the evidence thereby obtained is not subject to suppression.

Not to be overlooked in any analysis designed to determine whether

**37**

Allen Wayne Tucker spoke and acted in a manner, while he was in custody, that would permit his statements and deeds, and evidence obtained as a result thereof, to be used in the prosecution of him for any crime, is the presence of a written waiver of the very same constitutional protections the accused now seeks to assert. There does not appear in the record now before the Court sufficient credible evidence that would establish any conclusion other than that Allen Wayne Tucker was treated in a courteous and civil manner once he was in custody. No evidence of physical abuse has been offered nor, in the opinion of the Court, does any exist. Similarly, the Court is of the opinion that, although the very purpose of the in-custody interrogation was to elicit such information as may be in the possession of the accused, and such goal necessarily entailed the utilization of techniques designed to reduce the resistence of the accused to furnishing such information, there is no evidence that any constitutionally unacceptable ploys were resorted to by the persons conducting the interrogation. Indeed, the rapidity with which the accused began to detail the events that lead up to the homicides is even more verification of the previously mentioned intention of the accused and his family to obey their fundamental beliefs that they were obligated to cooperate with the law enforcement officers.

The evil sought to be prevented by *Payton v. New York*, 445 U.S. 573 (1980), as the Court understands the case, is the utilization by law enforcement officers of the arrest process as a ruse to search a premises in the hope of obtaining evidence upon which a criminal accusation may be predicated. In the case at bar, even if such as the motive for the manner in which the arrest of the accused was effected, absolutely no evidence was obtained from the motel room that is now sought to be suppressed. (Parenthetically, it is noted here that the accused was clearly possessed of "standing" to challenge the legal validity of the police entry into room 279 of the Days Inn Motel in Deerfield Beach.)

Assuming, however, that the entry into the motel room was not legally permisible, the events that followed—as now resolved by the Court—vitiate any primary illegality and mandate that the constitutional aspect of such subsequent events be determined upon their own merit. The teachings of *State v. Thomas*, 405 So.2d 462 (Fla. 3rd DCA 1981) requires that the incriminating statements be evaluated upon their own peculiar circumstances and without reference to the alleged primary illegality of the arrest. Other cases supporting this proposition are *State v. Cone*, 426 So.2d 1047 (Fla 3rd DCA 1983); *State v. Delgado-Armenta*, 429 So.2d 328 (Fla. 3rd DCA 1983); and *Delap v. State*, 440 So.2d 1242 (Fla. 1983).

38

Finally, as so well discussed in the Memorandum of Law submitted by the State in this cause in opposition to the Defendant's Motion to Suppress, the case of *Dorman v. United States*, 435 F.2d 385 (DC Cir. 1970), cited with approval and expressly recognized as valid law in *Welsh v. Wisconsin*, 80 L.Ed.2d 732 (1984), there were sufficient factors present to legally justify the warrantless arrest of Allen Wayne Tucker.

## CONCLUSIONS OF LAW

Defendant's Motion to Suppress Confessions, Admissions and Statements and the Fruits Thereof (Rifles/Knife) is hereby DENIED.