DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KAREEM ANDRE WILLIAMS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D16-570

[August 22, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn Kelley, Judge; L.T. Case No. 50-2013-CF-001250-AXXX-MB.

Carey Haughwout, Public Defender, and Narine N. Austin, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Jessenia J. Concepcion, Assistant Attorney General, West Palm Beach, for appellee.

CIKLIN, J.

Upon his return home from an outing, an elderly man was struck in the head and severely beaten by a burglar. The man was released from the hospital after staff determined his brain hemorrhage had resolved. In fact, it had not, and the man collapsed in his home and died. The appellant, Kareem Andre Williams ("the defendant"), argues, among other things, that his first-degree murder conviction should be reversed because the state did not prove that his actions caused the victim's death. We affirm on all issues raised, but we write to address the defendant's causation argument and a related argument regarding a requested special jury instruction.

We begin with a factual overview. The victim in this case was an eighty-year-old man who had spent the day shopping at the mall with his adult daughter. Upon arriving home, the victim pulled his car into the garage, and he and his daughter exited the car. The defendant appeared out of nowhere and attacked the victim, striking him on the head and causing him to collapse to the concrete garage floor. The defendant then

sat on top of the victim and continued beating him before fleeing the scene.

The victim was transported to the hospital, where he was given a CT scan. Medical staff noted that there was no bleeding on the brain, and the victim was discharged. Following the victim's release from the hospital, his CT scan was once again reviewed and this time a doctor noted there was a "tiny" amount of bleeding. The victim was readmitted into the hospital the next day. More CT scans were performed, and they were compared to the first scan. A doctor's notes reflected that the bleeding in the brain had completely resolved, meaning it was "no longer there." The victim was discharged the following day. That evening, the victim died in his home after collapsing onto his bed.

At trial, the state offered the testimony of two medical examiners: Dr. Reinhard Motte, a medical examiner for Palm Beach County, and Dr. Mark Shuman, a medical examiner for Miami-Dade County. A former colleague of Dr. Motte's had conducted the autopsy of the victim, but he was no longer employed with the office. Dr. Motte had reviewed his former colleague's autopsy findings, and he summarized them: There was "a large amount of bleeding on the surface of the brain." The area of the blood clot, or subdural hematoma, measured about three by two inches. Subdural hematomas are caused by "many things," but most of the time, they are caused by trauma. The subdural hematoma occurred on the front right side of the victim's head.

Dr. Motte opined that "[b]lunt force head trauma" and "bleeding in the brain" were the cause of death, and the manner of death was homicide. He had considered the treatment notes relating to the victim's admission and release from the hospital, and his opinion of the cause of death remained the same. Dr. Motte acknowledged that after the victim was released the second time from the hospital, "something" could have happened to him, but he also could have suffered from a "rebleed." He explained that a "rebleed" could have resulted from the initial injury to the victim's head, and that it can occur even where the bleeding was completely resolved. He concluded that the "last bleed, that very big bleed" was what "killed him at the end." Dr. Motte testified that for purposes of the autopsy finding, the medical examiner needs only a preponderance of the evidence to come to a conclusion as to the cause and manner of death, and that standard had been met.

Dr. Shuman also reviewed the victim's treatment and autopsy records. He opined that the hospital's reading of the first CT scan was "wrong." Based on his review of the CT scan, it was clear to Dr. Shuman

2

that the victim had suffered a subdural hematoma. Upon comparing the three scans that were done, he observed that "the blood was still there and was getting worse over the course of the three CT scans." Further, "on the third CT scan, there was some blood in an area that had not seen blood before." The three scans showed the "evolution" of the bleeding, "that it's actually continuing to bleed." He opined that the presence of new blood was consistent with the bleeding "continuing . . . and . . . accumulating." Dr. Shuman explained that "if you rupture some very large [blood] vessels . . . that go between the brain and the dura matter," the bleeding is probably "a lot faster," "[b]ut if you rupture some of the smaller ones, it's probably going to bleed slower." Further, a rupture could clot and unclot. Although a neurologist at the hospital believed the subdural hematoma "was gone," based on the second CT scan, Dr. Shuman disagreed. From his reading, "the bleeding was continuing." Additionally, the volume of blood he saw in the autopsy photographs was consistent with "the slow gradual bleed" he had observed in the three CT scans.

Dr. Shuman concluded that the cause of death was blunt head injury "from the assault" by the defendant and that the manner of death was homicide. He opined that "it would be hard to say that the assault had nothing to do with his death," even if the victim subsequently fell, as the continuing bleeding could have caused the victim to have "neurological issues," which could have led him to fall. But he acknowledged that if the hospital had not discharged the victim and continued in-hospital monitoring and treatment, "[t]here's a good chance" he would not have died.

Neither Dr. Motte nor Dr. Shuman could testify that there was any indication of a cause of death unrelated to the battery perpetrated by the defendant.

At the close of the state's case, the defendant moved for a judgment of acquittal on the murder count, arguing that the hospital's gross negligence was a "superseding and intervening" cause and thus the actual cause of the victim's death. The trial court denied the motion, and also denied the defendant's renewed motion at the close of all evidence.

*Cause of Death*

On appeal, the defendant argues that the state did not prove that his actions, as opposed to some other occurrence, caused the victim's death. He also argues that the hospital's gross negligence relieves him of criminal liability for the victim's death. We disagree with both

3

assertions.

Our standard of review is de novo.  *See Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002).  "A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence."  *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974).  The element at issue here is causation.

> In a criminal case expert medical opinion as to cause of death does not need to be stated with reasonable medical certainty.  Such testimony is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death.

*Delap v. State*, 440 So. 2d 1242, 1253 (Fla. 1983).  "Even though the state may be required to prove the cause of death beyond a reasonable doubt, this does not mean that every link in the chain of evidence must be so proved."  *Id.*

The Florida Supreme Court has elaborated on the effect of medical treatment on causation in a criminal case:

> A defendant cannot escape the penalties for an act which in point of fact produces death, which death might possibly have been averted by some possible mode of treatment.  The true doctrine is that, where the wou[n]d is in itself dangerous to life, mere erroneous treatment of it or of the wounded man suffering from it will afford the defendant no protection against the charge of unlawful homicide.  See, also, Wharton on Homicide (3d Ed.) § 35, wherein it is said that the subsequent neglect or mismanagement must have been the sole cause of death.

*Johnson v. State*, 59 So. 894, 895 (Fla. 1912) (citation omitted).  Our courts have followed the *Johnson* rule.  *See Fecske v. State*, 757 So. 2d 548, 549 (Fla. 4th DCA 2000) ("As a general rule, lack of affirmative medical treatment of the victim, whose initial injury was proximately caused by the defendant's actions, does not constitute an intervening cause relieving the defendant of criminal responsibility for the victim's death."); *Rose v. State*, 591 So. 2d 195, 199 (Fla. 4th DCA 1991) (recognizing that the *Johnson* rule "has been followed consistently"); *Barnes v. State*, 528 So. 2d 69, 70 (Fla. 4th DCA 1988) ("The rule in

4

Florida has long been that where an assailant inflicts a wound which is in itself dangerous to life, the supervening lack of optimal medical attention or affirmative medical malpractice is not an intervening cause of the victim's death." (quoting *State v. Smith*, 496 So. 2d 195, 196 (Fla. 3d DCA 1986))); *Tunsil v. State*, 338 So. 2d 874, 875 (Fla. 3d DCA 1976) (applying *Johnson* to find that appellant's actions were the proximate cause of the victim's injury, brain damage, and any lack of treatment by hospital was not an intervening cause relieving appellant of criminal responsibility for victim's death).

*Johnson* provides that an intervening occurrence does not cut off causation unless it is the "sole" cause of death. 59 So. at 895. "Sole" cause has been equated to a superseding or independent intervening act. For instance, in *J.A.C. v. State*, 374 So. 2d 606, 607 (Fla. 3d DCA 1979), a juvenile participating in a drag race was found guilty of vehicular homicide after his passenger died. The evidence at trial showed that while attempting to operate the gear shift, the passenger accidentally grabbed the steering wheel and caused the car to veer out of control, resulting in the passenger's death. *Id.* The appellate court found that the accident occurred "only because" of the victim's action, and thus the wrongful conduct of the juvenile was "superseded by the decedent's own independent intervening act." *Id.*

On the other hand, contributing, rather than sole, causes of death do not extinguish a defendant's criminal liability for a death. *See Weir v. State*, 777 So. 2d 1073, 1076 (Fla. 4th DCA 2001) (affirming denial of motion for judgment of acquittal where "[v]iewed in the light most favorable to the state . . . causation was established in this case by the testimony of Dr. Price, which showed that the single punch to the victim's head was the blunt trauma which caused the subarachnoid and subdural hemorrhage which, in turn, caused the victim's death," even if it could be said that the evidence established that the victim had a prior head injury making him more susceptible to death from the punch); *Hallman v. State*, 371 So. 2d 482, 486 (Fla. 1979) ("[E]ven if the hospital's negligence had contributed to the victim's death, this fact would not entitle Hallman to a new trial on his conviction."); *Tunsil*, 338 So. 2d at 875 (where victim of car crash was taken to the hospital in a coma and died after a physician failed to give him medication for a pulmonary infection, court found that "appellant's actions were the proximate cause of the victim's initial injury, i.e., brain damage, and we find no intervening cause relieving appellant of the criminal responsibility for the victim's death").

5

Here, there was evidence that the beating the victim suffered at the hands of the defendant resulted in a subdural hematoma and, based on Dr. Shuman's testimony, the bleeding continued and ultimately resulted in the victim's death. The record reveals no evidence that the initial injury was not life threatening and that the hospital's negligence was the sole cause of death.

*Special Jury Instruction*

In a related argument, the defendant challenges the trial court's failure to give a special jury instruction on causation. After the parties and the trial court discussed the issue of an appropriate jury instruction on causation, the trial court fashioned the following instruction:

> An issue in this case is whether the defendant caused the death of [the victim]. The state must prove beyond a reasonable doubt that but for the defendant's conduct the death would not have occurred. Lack of affirmative medical treatment is not an intervening cause which would relieve a defendant from criminal responsibility for a victim's death unless the lack of affirmative medical treatment is the sole cause of death.

Defense counsel objected to the instruction, arguing that it "tells the jury to ignore the medical malpractice," which would "undo the entire trial." Defense counsel requested the trial court add the following language to its proposed instruction: "However, notwithstanding the above, if you find that the medical treatment of [the victim] was grossly negligen[t], you must find the Defendant not guilty." The trial court found that the requested language was inconsistent with Florida law, and it gave the instruction it had fashioned.

On appeal, the defendant argues that his requested instruction should have been given. We disagree. We review this issue for an abuse of discretion. *See Garrido v. State*, 97 So. 3d 291, 294 (Fla. 4th DCA 2012). The requested instruction contained a misstatement of Florida law, which requires the intervening force to be the sole cause of death. If the jury had been given the requested instruction, it could have found that the hospital's treatment or lack thereof was not the sole cause of death, yet still found the defendant not guilty based on the hospital's negligence. The instruction read to the jury was based on the *Johnson* rule and fully represented an accurate statement of the law.

*Affirmed.*

GERBER, C.J., and GROSS, J., concur.

\* \* \*

*Not final until disposition of timely filed motion for rehearing.*